[Crim. No. 4309.   Second Dist., Div. Three.   Oct. 7, 1949.]

THE PEOPLE, Respondent, v. EDWIN R. WRIGHT et al., Appellants.

Morris Lavine and Frederic H. Vercoe for Appellants.

Fred N. Howser, Attorney General, and Henry A. Dietz, Deputy Attorney General, for Respondent.

VALLÉE, J.—Appellants Wright and Casey were convicted by a jury of grand theft. Motions for new trials were denied. They appeal from the judgments and the orders denying their motions for new trials. Each appellant contends that the evidence is insufficient to justify the verdict as to him, and that the court erred in giving instructions.

The evidence stated most favorably to respondent follows. On April 19, 1948, Ila Brown was employed as cashier and bookkeeper at the Alexander Market located on Washington Street near Rimpau in Los Angeles. Immediately after 2:30 p. m., that day, she left the market with about $8,800, including some $5,800 in cash, in a moneybag to be deposited in a bank located the second door down Washington Street. She had not quite reached the sidewalk when she felt someone pull on the moneybag held in her hand. She turned around, saw a strange man next to her, and screamed. The man took the bag, hurried away and entered a car parked at the curb. Mrs. Brown had not seen the man before. She testified that he had on coveralls and a cap like a train-

man wears, — a soft cap with a bill; that a cap shown to her which was found in the glove compartment of appellant Wright's automobile looked exactly like the one she saw. The car he entered was a light gray Plymouth coupé without a license on the rear. The car appeared to be new. There was another man seated in the car. Mrs. Brown only saw the back of his head. When the man who took the bag entered the car, it pulled away. She testified that appellant Casey looked like the man who took the bag; "he looks like the man, from his height and coloring and age, and all that"; that she was not sure it was Casey.

Lawrence Morain was seated in an automobile near by. He heard a scream, looked in the direction of the market and saw a man struggling with a woman. The man was 5 feet 8 or 9 inches, and wore a sort of olive-drab coveralls, green, such as were worn during the war by members of the armed forces. The man ran 12 or 15 feet to a light gray Plymouth coupé, about a 1947 model, which was parked against the curb facing west right near the scene of the scuffle, and entered it. A man who wore glasses was seated in the automobile in his shirt sleeves. Morain testified that the license plate on the car, which pulled off in a westerly direction, bore license number 75X530 on the front end and that there was no license plate on the rear end. He gave the license number to a clerk in the market, who wrote it down correctly. He saw the car a couple of days later at a police station. It was appellant Wright's car.

Booker Forston was operating a shoeshine stand across the street from the market. About 2:45 he heard a scream, looked up, and saw a man grab some money from Mrs. Brown, run, get in a car and speed away. The car was a light cream colored coupé. The man had a cap on something like the cap shown him. He did not see a license plate on the rear of the car.

Appellants had known each other about 30 years prior to the day of the theft. They were born in Oak Park, Illinois, grew up together, and had been neighbors in Chicago. Wright came to California in December, 1947, and engaged in the engineering business with an office at 8511 Sunset Boulevard, Los Angeles, at the time of the theft. He lived at the Hollywood Athletic Club, 6521 Sunset Boulevard, about 2½ miles from his office. Casey had been in California about six years and lived at 1625 South Vineyard, Los Angeles, about 3 to 5 blocks from the Alexander Market. He is a veteran. He had been employed by Wright for about three months between January and March, 1948. Casey knew where the Alexander

Market was located and had been there several times. He told a police officer, "I think I even know the girl." Wright knew where Casey lived and his exact address from memory. On April 12th or 13th, 1948, Wright went to Casey's home and got him out of bed at 8:15 a. m., ostensibly to talk about employing him. On the night of April 16, 1948, Wright and Casey met on the corner of Rimpau and Pico Streets about 7 blocks north of the Alexander Market at about 10 p. m., also ostensibly to talk about Casey's employment. Casey did not own an automobile. On March 12, 1948, Wright rented from a rental agency, and on April 19, the day of the theft, he had in his possession, a light gray Plymouth coupé, 1947 model, with license number 75X530, with both front and rear license plates attached. On occasions Wright parked this car in a parking lot at 6521 Sunset Boulevard, next door to the Hollywood Athletic Club, where he lived.

On April 19, 1948, about noon, Wright parked the car in the parking lot, went into the Athletic Club, had lunch, had a conference with Jack Cartwright, and then went with Cartwright to the lobby. When they arrived in the lobby "close to" 2 p. m., Casey was there. Wright stepped over to Casey, spoke to him a few moments and Casey left. A few minutes later Wright went to the parking lot, talked to the attendant, took the Plymouth, and about 2 p. m. left with Casey in the car. At that time both front and real license plates were on the car.

The police began an investigation of the theft about five minutes after it occurred. After learning that the Plymouth with license number 75X530 was rented to Wright, they went to the Athletic Club about 5 p. m., and found Wright wearing glasses in the lobby. Wright told them that the car was in the parking lot next door. Two officers and Wright proceeded to the parking lot where they found three men starting to wash the car. The rear end had not been washed. The car appeared to be quite clean. There were several fresh scratches just back of the license plate. The officers found a sort of denim cap in the glove compartment similar to those used by firemen and brakemen on railroads. Wright told the officers that he had bought the cap; he did not know where; he had a friend up in the country who had a farm or something; he was going to do some rock work up there; he bought it to wear up there; he had never worn it. Wright told the officers that he had arrived at the club at noon and had stayed until 3:15 or 3:30; he did not meet anyone downstairs in the club except Cart-

wright; when he left he drove directly to his office; he had not gone any place with the car that afternoon except to the club and to his office.

The officers examined the rear license plate. It was loose. There were three small bolts which fastened the plate to the rear end of the car, called the turtleback. The nuts on two of the bolts were very loose. They could be screwed or unscrewed with the fingers. The nut on the third bolt was missing. An officer found the missing nut on the pan between the bumper and the body of the car near the handle of the turtleback and placed it loosely on the bolt. He then lifted the turtleback three times and dropped it down hard. Each time the nut fell off and rolled into the back end of the car. In the rear end there was a place alongside of the spare tire for the tool kit. The kit was out of its place lying on the floor. A pair of pliers was out of the kit on the mat. The distance between the license plate and the turtleback was not more than one-eighth inch. Each of two officers was unable to place his finger between the license plate bracket and the body of the car.

On the face of the rear license plate, the officers found fingerprint smudges which they were unable to identify because there were water spots on the rear of the car. They found a print of Wright's right thumb in an upward position on the rear of the plate about 2 inches from the right-hand side as one faces the plate and about 1 inch from the bottom of the plate. When confronted with this fact and told that he must have had the plate off to get the fingerprint on it, Wright answered, ''I don't know what happened.'' He said that he had not had any occasion to be near the back plate; that the only time he had been near the turtleback was about a week before when he put a bed roll in the rear end of the car. On April 22d, Wright told the officers he thought he could explain how his fingerprint got on the license plate, and proceeded to do so. On the witness stand he admitted the story was a fabrication.

On April 20th, Wright was interrogated by police officers as to his movements on the 19th. He stated that he left his office about 12:40 p. m., arrived at the club about 12:50, had lunch, stayed with Mr. Cartwright on an upper floor from about 1:30 until 2:40 or 2:50, did not see anyone in the lobby, went to a linotype company and to the auto park next to the club about 3:25; he did not ''meet a soul'' in either the lobby or the auto park; he took his car out of the

park and drove directly to his office where he stayed until 4:50. One of the officers testified that after Wright had made this statement, the following occurred:

"Then I said, 'Well, Mr. Wright,' I said, 'the fact of the matter is,' I said, 'you left Mr. Cartwright much earlier than that, because I have two witnesses that will testify that you left that auto park no later than five minutes to 2:00.' And he said, 'No, it couldn't be.' He said, 'I left there about 3:30 or 3:25.' 'Well,' I said, 'these same two witnesses,' I said, 'are willing to state that you left there with another man.' I said, 'Now, isn't that a fact?' And he stopped a minute and he said, 'Well, yes, come to think about it I did leave there with another man.' I said, 'Well, who is that man?' He said, 'Dan Casey.' I said, 'Where does Dan Casey live?' He said, '1625 Vineyard.' I said, 'Have you known him long?' 'Well,' he said, 'he used to work for me.' And I said, 'It is a fact,' I said, 'that you met him in the club, didn't you, when you came downstairs after you talked to Mr. Cartwright? Didn't you tell Mr. Cartwright that you had to meet a man downtown, downstairs?' He said, 'Well, I don't remember, but,' he said, 'I met him, but I didn't meet him downstairs.' He said, 'I met him in the doorway of the Hollywood Athletic Club.' I said, 'You went out and got in the car with him?' He said, 'Yes.' I said, 'Where did you go after you left the auto park?' He said, 'I drove east on Sunset to Cahuenga, north on Cahuenga to Hollywood Boulevard and then west on Hollywood Boulevard, and I stopped at Hudson Street and I left Mr. Casey out at Hudson Street, Hudson and Hollywood.' I said, 'Where did you go then?' He said, 'I went directly to my office,' I said, 'Well, when you were with Mr. Casey,' I said, 'You know him quite well; he used to work for you.' He said, 'Yes.' I said, 'What was the purpose of him meeting you?' He said, 'Well, I was putting out this magazine for the Athletic Club and I thought that he might be able to sell that type of insurance, and' he said, 'he came to see me about a job.' I said, 'Well did you notice during this time whether Mr. Casey was drinking or was drunk or had been drinking during the time that you were with him in the car? You know him pretty well.' He said, 'Well, he might have had a drink,' he said, 'but I didn't notice that he was drinking or drunk.' He said, 'He talked all right to me. He said he wanted to get out of the car, that he had some shopping

to do.' '' Wright told the officers that he had not seen Casey for a month or more before the 19th.

On April 20th, about 5 p. m., the officers went to Casey's apartment, knocked, and rang the bell repeatedly, and received no answer. They entered with a key obtained from the owner and found Casey in bed. He appeared to have been drinking, and dressed reluctantly. He told the officers he had spent the 19th on Hollywood Boulevard getting a haircut and in about six bars. He named one bar, but did not name any others. He said he did not know what time he had returned to his home. He denied knowing Wright. Later he said he had known him for 30 years. An officer asked him how long it had been since he had seen Wright. He answered, ''Oh, I don't know. It has been quite awhile.'' The officer asked him if he had seen Wright ''yesterday.'' Casey answered, ''I don't want to answer that question. I don't know too much of what I did yesterday. I was drinking, you know. I was pretty drunk.'' Later that evening at a police station the officers told Casey they believed he was implicated with Wright in a robbery and asked him to give them the time and places he had attended on the 19th. He answered, ''I am not going to tell you anything. I don't know anything. I wouldn't do anything to hurt Mr. Wright. He is a great guy.'' The interrogation on April 20th was discontinued because Casey appeared to be in an intoxicated condition.

On April 21st, when interrogated by other officers as to his movements on the 19th, Casey told about getting a haircut and visiting a number of bars, naming some of them; that he was pretty drunk and did not remember what happened or where he was. He was asked if he had gone to the Hollywood Athletic Club. He replied, ''No. I didn't go there.'' He was asked if he had met Wright at the Hollywood Athletic Club and gone to the Alexander Market. He said, ''No. I wasn't there.'' He was asked if he had met Wright. He answered that he went to Wright's office about 4 o'clock about getting a job—''I was going to work for him selling advertising.'' He said he stayed about five minutes; that Wright gave him the ''brush-off''; that that was the only time he saw Wright that day; that he then got on a bus and went home, arriving about 6.

In a conversation on April 22d, between police officers and Wright and Casey, both being present, Wright said he met Casey as he was coming out of the club; that Casey got

in the car with him at the auto park, and he drove to Hollywood Boulevard near Hudson, where he let Casey out. One of the officers asked Casey if that was true. Casey replied, ''Well, I don't remember it, but if Wright says it, it must be so.'' The officers had Wright try on the cap found in the glove compartment. He could hardly get it on his head. They then had Casey try it on. It appeared to fit him perfectly.

An officer drove two different routes from the Hollywood Athletic Club to the Alexander Market at about 2 p. m., going about 30 miles per hour under normal driving conditions. One route was 4:9 miles. It took him 12½ minutes. The second route was about 5 miles. It took him 13½ minutes.

Casey testified he saw Wright twice on April 19th, once in the lobby of the Hollywood Athletic Club, about 1:30 p. m., when he talked to him about three minutes and left, and again at Wright's office about 4:30 p. m.; that he had had two drinks before meeting Wright at 1:30. He denied having been in the parking lot with Wright or leaving the lot in Wright's car. He testified he was not intoxicated on the 19th; that he had only two bottles of beer on the 20th, the day he was arrested, and was not under the influence of liquor at that time; that he had been at the Alexander Market a good many times and had traded there. He denied he was in the vicinity of the market on the 19th and denied he had anything to do with the theft.

Wright testified he had never removed the rear license plate. He admitted he told the officers he had removed it on the 18th and that this statement was false. He testified he met Casey about 2 p. m., on the 19th in the lobby of the club; that Casey got in the car at the parking lot about 2:15, and he drove him to Hollywood Boulevard, between Hudson and Cherokee, and then drove to his office, arriving there about 2:40; that he next saw Casey about 4:30 at his office, that he left his office about 5 p. m., drove to the club parking lot and gave instructions to have his car washed because someone suggested he have it done. Wright testified he purchased the cap found in the glove compartment of his car about a month before April 19; he did not try it on when he bought it; later when he tried it on he could not get it on his head. He testified he had raised the turtleback of the car at least 10 or 12 times before April 19; he had done so on April 17 and 18, although he had only driven between the club and his office on those days. He admitted having been at Casey's home on April 12 or 13, and having met him at

the corner of Rimpau and Pico about 10 p. m., on April 16, when he was with him about an hour. Wright denied he was in the vicinity of the market on April 19, and denied he had anything to do with the theft.

Counsel for Wright, in an able and exhaustive brief, discusses the evidence at length, arguing the credibility of the witnesses and the weight of the evidence. These were matters for the jury and for the trial judge on the motion for new trial. We think it manifest without discussion that there is substantial evidence sufficient to support the verdict against Wright. Casey argues that Mrs. Brown did not identify him positively; that she testified he looked like the man who took the moneybag "from his height and coloring and age, and all that," and that she was not sure it was Casey, and that the other facts and circumstances shown by the evidence merely arouse suspicion. ■ Unless it clearly appears that upon no hypothesis whatever is there sufficient substantial evidence to support a verdict, it cannot be set aside on appeal. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].) If the evidence reasonably justifies the verdict, our opinion that it might also be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury. (*People* v. *Perkins,* 8 Cal.2d 502, 511 [66 P.2d 631].) The rule that the circumstances relied upon by the prosecution must be consistent with guilt and inconsistent with an hypothesis of innocence, is a rule of instruction for the jury and is not the rule for the guidance of the court on review. Where the jury rejects the hypothesis pointing to innocence and there is evidence to support the implied finding of guilt as the more reasonable of the two hypotheses, we are bound by the finding of the jury. (*People* v. *Newland,* 15 Cal.2d 678, 682 [104 P.2d 778].) ■ It is the jury which must be persuaded beyond a reasonable doubt of the guilt of the defendant, not this court. (*People* v. *Smith,* 35 Cal. App.2d 73, 76 [94 P.2d 633].) Our function is to determine whether the evidence is of such character as, if believed, justifies conviction.

■ The circumstances implicating the defendant Casey were such as to meet this test. Casey and Wright were intimates. Casey's apartment was but 3 to 5 blocks from the Alexander Market. He knew the market well. By his own admission, he may have known the victim of the theft. He and Wright were together at his home on April 12 or 13. They were together again on April 16, at 10 at night on a street

corner not far from the place of the theft. Wright had a business office where they could have met. Casey met Wright at the club just before 2 p. m., on the day of the theft. He got into the car with Wright about 2 p. m., and drove away. The car was a light gray Plymouth coupé, with license number 75X530. Within about 30 minutes (ample time to remove the license plate and drive to Washington and Rimpau) a light gray Plymouth coupé with the rear license plate removed, and license number 75X530 on the front end, was used as the getaway car. Casey, from his height, age and coloring, looked like the man who took the moneybag. The man who took the money wore a cap exactly like the one found in the glove compartment of Wright's car. The cap fitted Casey. About 4 p. m., Casey met Wright at Wright's office. About 5 p. m., Wright drove the car into the club parking lot and directed that it be washed, although it appeared clean. Shortly after 5 p. m., the rear license plate was found to be loose and appeared to have been recently removed. The loose nut had not bounced off from between the bumper and the body of the car. Wright's fingerprint was on the inner side of the rear plate where it could not have been placed unless the plate had been removed. The jury could infer that Casey became intoxicated to throw the officers off the scent. He denied on the witness stand that he was intoxicated. He made false, evasive and contradictory statements to the officers. The jury was warranted in inferring that he testified falsely. These circumstances and the reasonable inferences therefrom are ample to support the verdict against Casey. (*Cf.*, *People* v. *Latona,* 2 Cal.2d 714, 721 [43 P.2d 260] ; *People* v. *Harris,* 87 Cal.App.2d 818, 823 [198 P.2d 60] ; *People* v. *Sturman,* 56 Cal.App.2d 173, 180 [132 P.2d 504] ; *People* v. *Stark,* 16 Cal.App.2d 467 [60 P.2d 595].)

We have examined the cases relied upon by appellants in which judgments of conviction were reversed because of insufficient evidence to connect the defendant with the offense charged. Analysis of them would unduly lengthen this opinion. Whether there is evidence to support the verdict depends upon the circumstances of each case. We find nothing in the cases relied upon which would justify a reversal as to either of them.

Appellants contend that the court erred in instructing the jury that an essential element of the crime of grand theft is criminal intent; that this does not mean that one must intend all the consequences of his conduct, or that he must know

that such conduct is unlawful, to be guilty of the offense charged; that the intent to do the forbidden act constitutes the criminal intent. (California Jury Instructions Criminal, No. 71.) They argue that a specific intent is an essential ingredient of grand theft; that a specific intent must be proved and may not be based on a presumption. Assuming without deciding that the giving of the instruction was error, it was not prejudicial. The evidence is conclusive that the theft was committed. Neither appellant contended otherwise in the trial court and neither contends otherwise here. The sole contention of each below and here is that the evidence is insufficient to connect him with the offense committed. Intent was not an issue. A man does not grab a bag of money, run away with it and keep it unless he intends to steal it. Under these circumstances the error, if any, was harmless.

■ Appellant Casey contends that the court erred in instructing the jury that the law provides that no act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. (California Jury Instructions Criminal, No. 78.) He argues that if he was so intoxicated as not to be conscious of his act, such fact could be taken into consideration by the jury in determining the intent with which the act was committed. At the trial Casey testified and claimed he was not intoxicated on the day of the theft. As we have said, the question of intent was not an issue. The instruction obviously was not prejudicial. There was no implication in the instruction that the court thought him guilty, as appellant Casey argues.

■ Appellants claim the court erred in telling the jury that where a defendant makes false, evasive or contradictory statements in the face of an accusation expressed directly to him or in his presence charging him with the offense for which he is on trial or tending to connect him with its commission, and they find that he heard the accusation or understood its nature, his conduct may be considered against him as indicating an admission that the accusation thus made was true. (California Jury Instructions Criminal, No. 30.) Appellants argue that ''When a person is accused of crime, it is not the statement that constitutes an admission, but it is silence that is an admission—not the making of false, evasive or contradictory statement that constitute an admission.'' The argument is fallacious. The making of a false, evasive or contradictory statement may constitute an admission. (Code Civ. Proc., § 1870, subd. 3; *People* v. *Simmons*, 28 Cal.2d 699,

712, 718 [172 P.2d 18] ; *People* v. *Megladdery,* 40 Cal.App.2d 748, 784 [106 P.2d 84].)

The judgments and orders are affirmed.

Shinn, P. J., and Wood, J., concurred.

A petition for a rehearing was denied October 20, 1949, and appellants' petition for a hearing by the Supreme Court was denied November 3, 1949.