[Crim. No. 5881.   In Bank.   Mar. 29, 1957.]

THE PEOPLE, Respondent, v. JOHN HACKLEY DAVIS et al., Appellants.

Harry M. Umann, under appointment by the Supreme Court, Forno & Umann, William Strong, Joseph A. Ball, Clarence S. Hunt, Grant B. Cooper and Ned R. Nelson for Appellants.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, S. Ernest Roll and William E. McKisson, District Attorneys (Los Angeles), Adolph Alexander, Chief Deputy District Attorney, Lynn D. Compton and Gordon W. Jacobson, Deputy District Attorneys for Respondent.

SHENK, J.—The appeals in this case are from judgments imposing the death penalty and from orders denying motions for a new trial.

Lynn V. Feaster, night clerk in a Long Beach liquor store, was killed on the morning of December 23, 1953. He had been shot in the mouth, apparently about midnight. His body was lying near the open cash register drawer and his revolver, still fully loaded, was found near his head. He had a habit of reaching for his gun during a holdup, and in prior holdups had killed three men and captured others. The lethal weapon was never found. No one witnessed the shooting. Nothing was found on the premises which would connect the defendants with the homicide.

Later on police officials investigated certain check forgeries in the Los Angeles area and discovered evidence to the effect that these defendants had jointly participated in forging and passing checks on the Budwalt Engineering Company on October 30, 1953; that defendant Davis had subsequently passed other Budwalt checks, including one on the night of December 22, 1953, and that shortly thereafter both men had fled the area, Davis going to the northern part of the state and Morse going to St. Louis, Missouri. Information was given to the police by Darrell Davis, the 16-year-old son of defendant Davis, that he had been out with the defendants on the night in question; that the defendants had gone into this liquor store in Long Beach about midnight, and that after he and his father returned home he overheard his father tell a Mrs. Rondon that he and defendant Morse had gone into the store for the purpose of cashing checks; that the clerk "didn't go for it" and they decided to rob him, and that Morse had then

pulled a gun and shot the clerk in the mouth. Mrs. Rondon's version of Davis's statements to her that night was somewhat different, mainly to the effect that Davis had said that as he was going into a liquor store he saw a man who looked like Bill shoot the clerk in the mouth. The defendants were charged with first degree murder. Each entered a plea of not guilty. The sole defense was an alibi. A motion by the defendant Morse for a separate trial was denied. The jury returned verdicts finding the defendants guilty of murder in the first degree and the death penalty was imposed. Motions for new trial and to reduce the penalty to life imprisonment were denied. Separate appeals were taken.

The defendants urge that the evidence was insufficient to support the verdicts; that illegally obtained evidence was improperly admitted; that errors occurred in the admission of evidence and in giving certain instructions; that there was prejudicial misconduct on the part of the prosecuting attorneys; that the trial court abused its discretion in not ordering separate trials; that by reason of prejudicial misconduct of counsel for Davis at the close of the trial and in his argument to the jury both defendants were denied a fair trial, and that the court abused its discretion in denying motions for new trial based upon the grounds set forth in section 1181 of the Penal Code and upon the further ground of newly-discovered evidence as to the mental illness of counsel for Davis during and after the trial. Davis was represented by other counsel on the last two days of the trial and on his motion for a new trial. He is also represented by other counsel on this appeal.

Throughout the six weeks of trial it was the theory of the prosecution that these defendants had engaged in a conspiracy to forge checks; that this conspiracy existed on the night of the homicide; that it was in pursuance of this conspiracy that the defendants had entered the Long Beach liquor store on the night of December 22, 1953, and that the killing which resulted was either with malice aforethought or it had occurred during an attempt to perpetrate a robbery (Pen. Code, § 211) or a burglary (entry with intent to commit a felony, forgery, Pen. Code, §§ 17, 459, 473). It was the theory of the defense that the alleged conspiracy did not exist and, as stated, that neither defendant was present at the scene of the homicide.

The extrajudicial statements testified to by Darrell and Mrs. Rondon were admitted initially only as to the defendant Davis. Darrell Davis first testified as a witness for the prose-

cution.  Later he stated that he desired to change his testimony; that much of his earlier testimony had been the result of suggestions made to him by police officers; that it was not the result of his independent recollection, and that he now desired to testify as a witness for his father.  █  As to the conflicting testimony of Darrell Davis the jury might have accepted a portion of his testimony and disbelieved the remainder.  (*People* v. *Crooker*, 47 Cal.2d 348, 355 [303 P.2d 753] ; *People* v. *Hill*, 126 Cal.App.2d 378, 380 [272 P.2d 113] ; *People* v. *Dragoo*, 121 Cal.App.2d 322, 324 [263 P.2d 90].)

█  It cannot be said that the testimony of Darrell was inherently improbable.  It was for the jury to determine its weight.  However, in view of the nature and character of the testimony of this witness, and that as to other witnesses the evidence was conflicting, it should not be held that the evidence was so conclusive in favor of the prosecution as to deprive the defendants of a reevaluation of the factual situation on a new trial.  In such event there are other questions presented which should receive consideration.

█  Both defendants urge that certain items of evidence were obtained by illegal search and seizure.  The circumstances of the search were as follows.  On September 3, 1955, Inspectors Bennett and Wiggins of the Long Beach Police Department went to the trailer court in Salt Lake City where the defendant Davis was then living.  They were accompanied by Detective Orencole of the Salt Lake City Police Department, and he participated in the arrest of Davis.  They had reason to believe that Davis had committed the felonies of forgery and murder.  They met Davis near his trailer and told him he was under arrest.  He readily admitted that he had forged checks in California, stated that he was willing to go back to California with the officers and answer charges in connection therewith, and that he would tell them anything they wanted to know.  He was friendly and cooperative, invited them to come inside the trailer with him, and offered to tell them where to find anything they wanted.  At his direction they searched the trailer for two check protectors and found them.  They then took him to the Salt Lake City jail where he remained in custody until his return to California.  The following day Officer Bennett visited Davis at the jail.  Davis asked him: "Did you get that book of checks?"  Bennett answered "No."  Davis told him to look on the floor under the bottom drawer of the sink.  The officers returned to the trailer.  From the cooperative and friendly attitude

of Davis and from his offer to get anything they wanted from the trailer or to tell them where it was, and from his remarks that he didn't want his trailer torn up, they testified that they believed Davis had given them complete permission to make an orderly search of the trailer. Under a sofa in the trailer they found a blank envelope, a letter purportedly written by defendant Morse, and a lint-covered copy of the Los Angeles Mirror of December 23, 1953, which had been folded to an inside page containing an account of the Feaster killing. The court determined that Davis had led the officers to believe that he had given permission to search the trailer and that the search was lawful. The evidence supports that conclusion. Having been made pursuant to the permission given the search was lawful and the evidence was properly admissible. (*People* v. *Burke,* 47 Cal.2d 45 [301 P.2d 241]; *People* v. *Michael,* 45 Cal.2d 751, 753-754 [290 P.2d 852]; *People* v. *Gorg,* 45 Cal.2d 776, 783 [291 P.2d 469]; *People* v. *Stewart,* 144 Cal.App.2d 555 [301 P.2d 301]; *People* v. *Lujan,* 141 Cal.App.2d 143 [296 P.2d 93].)

█ It is contended that the court erred in admitting evidence of accusatory statements and of the conduct and replies of the defendants with reference to questions propounded to them by police officers prior to the trial. Each defendant was then separately questioned. The court properly limited the evidence as to the defendant concerned. (*People* v. *Leary,* 28 Cal.2d 727, 734 [172 P.2d 34].) █ Davis complains that this evidence as to him was inadmissible because the questioning took place while he was in police custody. Such custody does not of itself make the evidence inadmissible. (*People* v. *Simmons,* 28 Cal.2d 699, 716 [172 P.2d 18]; *People* v. *Amaya,* 134 Cal. 531, 536 [66 P. 794].) However, it is a circumstance which may be taken into consideration by the court in the first instance in determining its admissibility and by the jury in determining its weight. █ Accusatory statements and the responses thereto are admissible under a well-recognized exception to the hearsay rule. █ As stated in *People* v. *Davis,* 43 Cal.2d 661, 670 [276 P.2d 801], "If the accused person expressly admits the truth of the accusatory statement, both the statement and answer may be admitted. If the accused person expressly denies the accusatory statement, there is no admission. █ If the accused makes an evasive or equivocal reply which is not directly responsive to the accusatory statement, or remains silent, it has been held that under certain circumstances both the accusatory statement

and the response are admissible.'' Each case must be determined upon its own facts.

The evidence of accusatory statements offered as to Davis shows reactions coming within each of these classifications. A proper foundation was laid for the admission of this evidence.

█ With reference to the admission of certain other evidence a proper foundation was not laid. Statements were made prior to the trial by witnesses on behalf of the defendant Morse in support of his alibi. They were made before police officers and were reduced to writing by a stenographer. The witnesses at that time signed written copies of their statements. At the trial the prosecution sought to impeach them and laid a foundation as to time, place and persons present when their prior statements were made but failed to show them the written copies which they had signed. Although these writings were not originally prepared by the witnesses they clearly come within the requirement of section 2052 of the Code of Civil Procedure.* This evidence was therefore improperly admitted without a proper foundation.

█ There was no error in giving an instruction that the evidence was such that the defendants were guilty of first degree murder or were innocent. The case was tried solely on that theory. No instruction on second degree murder or on any other offense was requested or appropriate.

█ There is no merit in the contention that instructions on conspiracy were improperly given because conspiracy had not been charged. It was one of the issues at the trial and instructions thereon were required. CALJIC instructions were given and the correctness thereof is not complained of.

█ The court instructed the jury on ''Silence or False or Evasive Reply'' as set forth in CALJIC Number 30 as follows: ''If you should find from the evidence that there was an occasion when a defendant, under conditions which fairly afforded him an opportunity to reply, failed to make denial (or made false, evasive or contradictory statements), in the face of an accusation, expressed directly to him or in his presence, charging him with the crime for which he now is

---

*Section 2052 provides that ''A witness may . . . be impeached by evidence that he has made, at other times, statements inconsistent with his present testimony; but before this can be done the statements must be related to him, with the circumstances of times, places, and persons present, and he must be asked whether he made such statements, and if so, allowed to explain them. If the statements be in writing, they must be shown to the witness before any question is put to him concerning them.''

on trial or tending to connect him with its commission, and if you should find that he heard the accusation and understood its nature, the circumstances of his silence (and conduct) may be considered against him as indicating an admission that the accusation thus made was true. Evidence of such an accusatory statement is not received for the purpose of proving its truth, but only to explain the conduct of the accused in the face of it; and unless you should find that the conduct at the time indicated an admission that the accusatory statement was true, you should entirely disregard the statement.''

This instruction has been given and was approved in *People* v. *Chessman*, 38 Cal.2d 166, 181 [238 P.2d 1001]; *People* v. *Hays*, 101 Cal.App.2d 305 [225 P.2d 600]; *People* v. *Miner*, 96 Cal.App.2d 43, 54 [214 P.2d 557]; *People* v. *Wright*, 94 Cal.App.2d 70, 80 [210 P.2d 263]. Davis contends that this instruction was insufficient, that the jury should have been further instructed on his right to refuse to answer under the constitutional privilege against self-incrimination. No request for such further instruction was made by either defendant. ▇ As to defendant Morse there was evidence that on being informed of the accusations which tended to implicate him in the murder he ''became very nervous and upset.'' His responses to questions put to him contain admissions and false and equivocal statements, but he urges that the only inference which could be drawn therefrom was a consciousness of guilt of forgery, not a consciousness of guilt of murder. On the record here presented the jury was entitled to draw inferences as to both.

▇ It was not error to give an instruction that the forgeries committed by defendant Davis after the homicide could be considered for the purpose of determining flight or the bearing such flight might have on the question of guilt. Flight may be indicative of guilt. (*People* v. *Santo*, 43 Cal.2d 319, 330 [273 P.2d 249]; *People* v. *Hoyt*, 20 Cal.2d 306, 313 [125 P.2d 29].)

▇ The court instructed on robbery in terms of the statute (Pen. Code, § 211). It was not error not to further define the meaning of the words ''felonious taking.'' In defining burglary the court instructed that ''any person who enters any building or store with the intent therein to commit theft or any felony is guilty of burglary.'' Immediately before this it had instructed the jury that the crime of forgery is a felony. No error appears by reasons of the failure of

the court to give more explicit instructions on "robbery" or "burglary."

▮ Complaint is made by both defendants as to the instruction given on penalty. The court gave California Jury Instructions—Criminal, Instruction Number 306, as requested by the People and by counsel for the defendant Morse, but added thereto that "under the law of the State of California when a person is sentenced to life imprisonment, it does not necessarily mean that he will remain in prison for the rest of his natural life. A person sentenced to life imprisonment may be pardoned or he may be paroled, but not until he has served at least seven years. (*People* v. *Byrd,* 42 Cal.2d 200 [266 P.2d 505].)" In anticipation of this instruction the deputy district attorney argued to the jury that "the judge will tell you that life imprisonment in this state doesn't mean life imprisonment. This may surprise you. He will tell you that a person who gets life imprisonment in this State can get paroled in seven years, seven calendar years. That is not a very good trade, seven years of their life for the rest of Mr. Feaster's life." No showing was made that the defendant asked to be allowed to produce evidence of, or to comment on the minimum, average and maximum terms of imprisonment actually being served for first degree murder in California. Neither the argument nor the added instruction was improper.

It is charged that the deputies of the district attorney, two of whom conducted the prosecution, were guilty of prejudicial misconduct during their argument to the jury. The instances which form the basis of the charge have been examined. Some of them were not objected to at the time and were not objectionable if they had been. Some were cited as misconduct and ruled on by the court. Some were properly found to be objectionable and the jury instructed to disregard them. It is unnecessary to discuss them in detail for the reason that on a retrial they should not recur.

▮ The court did not abuse its discretion in denying the motion of the defendant Morse for a separate trial.

Finally the defendant Davis contends that during the last two days of the trial his counsel was guilty of misconduct in the presence of the jury and that this deprived him of a fair trial. The defendant Morse joins in this contention and urges that the asserted misconduct of counsel for Davis also prejudiced his cause. Both defendants seek a new trial on this ground.

Throughout the trial counsel for defendant Davis consistently followed the theory that his client was innocent and that he had an alibi defense. He offered witnesses, including the defendant Davis, in support of that theory. He introduced evidence to impeach prosecution witnesses who testified adversely to Davis' claim of alibi. And he vigorously sought to show that the testimony of Darrell Davis as a witness for the prosecution was the result of coaching and suggestions by police officers and deputy district attorneys. In his first argument to the jury, which consumed the most of two days, he adhered to the same theory. In it he vehemently accused the police officers of having ''brainwashed'' Darrell and compared them to the persecutors of Cardinal Mindszenty. He berated the two deputies of the district attorney, charging that they had concealed from Darrell the fact that they were going to demand the death penalty for his father and that they had improperly influenced his testimony. He concluded his argument the afternoon of January 10th. A deputy district attorney then began the closing argument for the prosecution but did not conclude on that day. The following morning counsel for Davis requested permission from the court to interrupt the deputy district attorney and make what he called some corrections in his argument of the previous day, stating that when he had denounced the attorneys for the prosecution and the police officers he had done them a great injustice, and that he wanted to review his theory of the case ''to clarify what I believed to be true yesterday and today I believe to be false.'' The court enquired if he was referring to the testimony of witnesses. He answered that he was. The trial judge remarked that this was an unusual procedure, one that had never occurred before in his judicial experience. After cautioning the jury that attorneys were permitted to state opinions about the evidence and to state their theory of the case but that their argument was not evidence, the court permitted him to resume his argument. He then told the jury that he had ''believed yesterday'' that his theory of the case was correct ''but now I have analyzed the case in my mind, my conscience tells me that I must do what I believe is the right thing. I believe that I have been on the wrong track. Here is what I believe to be true.'' He then proceeded to reconsider the evidence in the light of his ''new theory.'' He referred to matters not in evidence as facts which were true. For example, he referred to the check-passing activities of the defendants on October 30, 1953, as being

"another transaction in which Darrell was present." There was no testimony that Darrell had then been present and there was positive testimony that he had not been present. His client had testified that he had not gone to the liquor store and that he had not been with Darrell or his codefendant Morse on the night of December 22, 1953. Counsel for Davis proclaimed to the jury, "I have reasonable grounds, after searching my mind, to believe that Davis did go to that liquor store that night and that Darrell was with him out in the car and he did see what he saw and he did run away and he did go home and he did tell . . . [Mrs.] Rondon exactly what she testified to in this case"; that he believed that his client, out of fear of the defendant Morse had "high tailed it out of town" the day following the killing. Davis had testified that he had gone into a bar in the early morning of December 23, 1953, and had there met a person known as "Bifocal" who had told him that "his boy" had shot a liquor man, and that he, Davis, had thought that "Bifocal" referred to Morse because Morse was the only person Davis had been working with. "Bifocal" testified as a prosecution witness and denied that he had made any such statement to Davis. Davis' counsel told the jury that he believed that "Bifocal" had testified truthfully at the trial; that his client Davis had to say that "Bifocal" had told him about the murder because he was "spotted," that is, that he was actually present at the liquor store when the shooting occurred, and that Davis in his testimony "couldn't possibly put himself there because it would have been a confession." Davis' counsel then attacked the credibility of Darrell, whom he had offered as a defense witness, and called him a psychopathic liar. He apologized again and again to the deputies of the district attorney and to the police officers for having wrongfully accused them. And he professed his belief that they had not coached or misled the witness Darrell. He told the jury, "I have made one interpretation before. I have seen the light. I saw it before, and I was wrong. Today it all holds together. I believe that the witnesses in this case have been telling the truth." From the context of his argument the witnesses for whom he vouchsafed were prosecution witnesses.

At the conclusion of this affirmation of new beliefs on the part of counsel for Davis, counsel for Morse asked to approach the bench. Davis' counsel interrupted to ask if he could further clarify his remarks. Upon receiving permission he

went on to state to the jury that there was one point he had failed to mention, that "if Mr. Davis did see what he saw, that the party must have been facing toward the wall and he didn't see any scar on the face* and that he hadn't seen Billy Morse since October 30th because there are no checks of his. That is what caused him to believe that it was Billy Morse. But the evidence in this case, in my opinion, there is no evidence that I have stated that Billy Morse was there, because the record shows that [Davis] thought 'I think it was Billy Morse.' Billy Morse has an alibi and I don't want to say in any way or innuendo by my statement that he was actually there; that Mr. Davis thought. Now that explains the knowledge, as I see it, how Mr. Davis actually was able to go through this story, as I have told it."

Counsel for Morse advised the court that he was still somewhat in a quandary. The trial judge remarked that the purpose of the remarks by counsel for Davis, as he understood them, was to correct some misstatements that he had made and to apologize to the officers he had accused, and that he had permitted counsel to do this entirely for the purpose of allowing him to correct his theories insofar as the police officers and deputy district attorneys involved were concerned. Thereafter the prosecution concluded its argument. The jury was instructed and retired to consider its verdict.

The following day, January 12th, while the jury was still deliberating, counsel for Davis conducted himself in an odd, unusual and irrational manner. That evening he was picked up on the street and taken to a hospital for treatment of what was diagnosed to be an acute mental disorder. He was sobbing and hysterical with fear. He was incoherent and disorganized in his speech, was disheveled in appearance, and could not even remember his wife's name, the name of his partner, his telephone number or any of the events of the past four days. While he was under hospitalization the jury returned to the courtroom for further instructions on "penalty."

At the hearing on the motions for a new trial it was urged, as above stated, that counsel for Davis had become mentally disturbed during the trial and that as a result of

---

*Morse had 28 stitches taken in his face on November 17, 1953, in St. Louis, Missouri. The resulting scar was still quite visible at the time of the trial. The fact that he had been in St. Louis was argued as evidence in support of his alibi. The fact that Darrell did not remember noticing the scar in December 1953, was urged by the defense as evidence that Darrell had not actually seen Morse during that month.

his irrational conduct both the defendants had been deprived of a fair trial. Affidavits were filed by lay persons as to the appearance and deportment of Davis' counsel on January 11th and 12th. None of the affiants sought to qualify as an intimate acquaintance within the meaning of subdivision 10 of section 1870 of the Code of Civil Procedure so as to give an opinion as to his sanity. Affidavits of expert medical witnesses chosen from the court panel were presented by the defense all of which were to the effect that Davis' counsel was mentally ill on the 12th of January; that this condition had probably existed for several days prior thereto, and that this had affected his ability to act in a rational manner during the closing hours of the trial. No contradictory medical testimony was offered. The court recognized that counsel for Davis had suffered a nervous breakdown but concluded that its effect was not serious enough to justify a new trial.

The request to make a supplemental argument is, as the trial court expressly stated, unusual. However, there is no question of the power of the court in the exercise of a sound discretion to grant such permission, nor of the right of counsel for the defendant with such permission to supplement his argument to the jury in an appropriate way.

Whatever trial strategy or tactics an attorney may employ in the defense of an accused he may not enter a plea of guilty to a felony without the consent of his client. (Pen. Code, § 1018.) It is a violation of his duty of fidelity to his client to assume a position adverse or antagonistic to him without the latter's free and intelligent consent after full knowledge of all the facts and circumstances.'' (*Anderson* v. *Eaton*, 211 Cal. 113, 116 [293 P. 788].) This consent was not given. Without such consent an attorney may not surrender any substantial right of the accused. (*Hoagland* v. *Chargin*, 134 Cal.App.2d 466, 474 [286 P.2d 931]; *Redsted* v. *Weiss*, 71 Cal.App.2d 660, 663 [163 P.2d 105]) nor may he impair, compromise or destroy his client's cause of action. (*Zurich General Acc. & Liab. Ins. Co., Ltd.* v. *Kinsler*, 12 Cal. 2d 98, 105 [81 P.2d 913], citing with approval *Price* v. *McComish*, 22 Cal.App.2d 92 [70 P.2d 978]; *Witaschek* v. *Witaschek*, 56 Cal.App.2d 277, 283 [132 P.2d 600].)

It is the right, and sometimes the duty, of an attorney to undertake the defense of a person accused of crime. Otherwise, as stated in Canon 5 of the Canons of Professional Ethics of the American Bar Association, ''innocent persons, victims only of suspicious circumstances, might be denied

proper defense. Having undertaken such defense, the lawyer is bound, by all fair and honorable means, to present every defense that the law of the land permits, to the end that no person may be deprived of life or liberty, but by due process of law.'' Under the law it is the duty of an attorney ''To counsel or maintain such . . . defenses only as appear to him legal or just, except the defense of a person charged with a public offense.'' (State Bar Act, Bus. & Prof. Code, § 6068.) The concept of the exception is reflected, at least in part, in the Canon of the American Bar Association above quoted.

The issues in a criminal case must be decided in accordance with the evidence. The jury is the exclusive judge of the questions of fact submitted to it and of the credibility of the witnesses presented. (Pen. Code, § 1127.) Counsel may not offer the testimony of a witness which he knows to be untrue. To do so may constitute subornation of perjury. In arguing to the jury he is limited to a discussion of or to comment upon the facts in evidence.

From a review of the evidence presented at the trial and the statements made by counsel for Davis in his supplemental argument to the jury it is difficult to conceive a more direct and positive change of position to the prejudice of Davis, or one more injurious to his right to have the jury fairly consider his theory of defense as disclosed by the evidence. That this was done is further evidenced by the reasonable inference that might be drawn by the jury from the supplemental argument that Davis had told his counsel that he was actually present at the scene of the murder. That this inference was obvious is indicated by the comment of the deputy district attorney in his final argument to the effect that counsel for Davis could not now say that Davis had been there unless ''Davis . . . told him he was there.'' The fact that Davis later filed an affidavit in support of his motion for new trial in which he denied that he had ever told his counsel that he was present at the shooting and in which he averred that ''any statement to the effect that he was present would be absolutely false'' would not obviate the damage theretofore done to his defense in the minds of the jurors.

The argument of counsel for Davis also prejudiced the rights of his codefendant Morse to a fair trial. They were jointly charged, tried and convicted. There was evidence that both had jointly participated in the commission of the

offense. When Davis' counsel placed Davis at that scene the effect on the jury could have been the same as to the defendant Morse. Where the rights of defendants have suffered such an interference or interruption as to fatally affect the regularity of the trial and conviction, a miscarriage of justice has resulted and both defendants are entitled to a new trial. (*People* v. *Crooker, supra,* 47 Cal.2d 348, 352-354 [303 P.2d 753].) This result may rightly be said to have come about because of the temporary mental upset on the part of counsel for Davis. If the conduct here found to have been prejudicial to the rights of the defendants had been committed by an attorney in full possession of his mental faculties a serious breach of professional duty might well be disclosed. However, a review of the record, including the showing as to the physical condition and appearance of counsel for Davis just before and at the time of his supplemental argument and the showing made on the proceeding for a new trial, is convincing proof that he was not guilty of any purposeful professional misconduct.

The judgments and the orders denying motions for a new trial are reversed.

Gibson, C. J., Carter, J., Traynor, J., Schauer, J., Spence, J., and McComb, J. concurred.

Respondent's petition for a rehearing was denied April 25, 1957.