[Crim. No. 3067. Third Dist. July 29, 1960.]

THE PEOPLE, Respondent, v. WILLIAM (BILL) DUARTE, Appellant.

William J. Harris, Jr., for Appellant.

Stanley Mosk, Attorney General, Doris H. Maier and John F. Foran, Deputy Attorneys General, for Respondent.

WARNE, J. pro tem.*—This is an appeal from an order denying a motion for a new trial and from a judgment

*Assigned by Chairman of Judicial Council.

entered upon a jury's verdict which found appellant guilty of burglary in the first degree.

One Anthony DiGiorgio, a codefendant, was acquitted.

The record in this case reveals that sometime during the evening of July 3d and the early morning hours of July 4, 1959, the home of Frank G. Noyes, located at 3131 Browns Valley Road in Napa, was burglarized. Mr. and Mrs. Noyes were away for the weekend, but a housekeeper residing in a cottage separate from the main house remained on the premises. On the morning of July 4, 1959, the housekeeper discovered that her employers' safe, usually kept in a closet of the main house, had been moved from its usual spot and had been broken open. The contents were removed. Among the articles taken in the burglary was a red leather jewel box with a monogram on it which had been located in the safe at the time in question. The red leather jewel box contained Mrs. Noyes' jewelry which was valued for insurance purposes at $40,000.

Also taken from the safe in the burglary were some gold coins, including some small pieces perforated or pierced to hang on a chain and some commemorative or collector's coins. These were contained in a small brown leather box. Some dress studs were also taken.

One Harry McCloskey, a resident of Los Angeles, testified for the prosecution. McCloskey and his wife were living in Los Angeles until July 11, 1959, at which time they left on a vacation trip. On this trip they passed through Las Vegas, Nevada, Utah, Montana, and ended up in Seattle, Washington.

On August 3, 1959, Harry McCloskey left Seattle, Washington, alone and headed for Los Angeles. Enroute he stopped in San Jose, and upon arriving there he called a friend, one Louis Forest. Forest met McCloskey at a bar, at which time he was introduced to the appellant.

The next day, by a previous arrangement, appellant again met McCloskey near the same bar and a conversation ensued to the effect that appellant had some jewelry which he wanted to dispose of and which he wanted McCloskey to handle. McCloskey agreed but stated that he wished to see it first. They went to a basement at 353 Washington Street, San Jose, where McCloskey was introduced to Tony (DiGiorgio) as an acquaintance from Los Angeles. Appellant then asked Tony to bring the "stuff" out and let McCloskey look at it. DiGiorgio brought the jewelry out and placed it on an arm of the davenport. Among the articles displayed were the red

leather jewel box and also the other jewelry identified by the owner as having been taken in the burglary. Appellant decided to go to Los Angeles to dispose of the jewelry. McCloskey was to receive 10 per cent of the sale price, or if a sufficient price were obtained $1,000.

DiGiorgio also brought out a small tan or beige leather box. This box had some gold coins in it, including $20 gold pieces, $5 gold pieces and some commemorative half dollars. Some of the coins, specifically the small ones that had holes drilled in them, were taken from the tan box, wrapped in tissue paper and put in the red leather box. Appellant and McCloskey then departed for Los Angeles in McCloskey's car taking the jewelry with them. Enroute from San Jose to Los Angeles appellant told McCloskey that he had obtained the jewelry from a "Can in a retired bank president's house" somewhere "up north." The witness testified that as an exconvict he understood the word "can" to mean a safe.

Arriving in Los Angeles appellant and McCloskey went to the latter's residence. After an attempt by McCloskey to get in touch with an acquaintance in Long Beach, the two men decided they could not do anything about disposing of the jewels until the following Monday. They did however sort out the jewels and transfer them from the red leather jewel box to a small green metal box belonging to McCloskey. Not all of the articles were placed in the green metal box because when the transfer was being made McCloskey declared he did not want any watches as they could be traced by their serial numbers. Appellant also declared that he wished to hold out certain pieces, including a large brooch or clasp and some other items. Certain items which McCloskey termed "junk" and included shirt studs and a ring without a setting were more or less discarded in sorting. McCloskey then pawned some of the items at Jack's Loan Company in Los Angeles to obtain money to enable him to travel around and see about disposing of the other articles.

The appellant told McCloskey that there was no "heat on this stuff," and he thought McCloskey could take it to a legitimate jeweler. McCloskey took the jewelry to Weinstein Jewelry Company in an attempt to sell it. Weinstein Jewelry Company agreed to purchase all of it, and he left the jewelry with the understanding he was to return the next day to collect the money. McCloskey upon returning from the jewelers told appellant that Weinstein Jewelry Company was only willing to pay $1,650 for the jewelry, and the appellant replied that "I can only give you a hundred and a

half then, and the watch you got on." That night appellant and McCloskey put the red leather jewel box in a paper sack and proceeded to the California Bar in the 900 block of West 6th Street in Los Angeles, where McCloskey placed the bag and contents near the door as they entered. They did so because McCloskey wanted to get it out of his place of residence. The bag containing the red leather jewel box was subsequently discovered by the bartender and turned over to the police. The bartender testified that he saw McCloskey and appellant in his bar twice on the night that the red leather jewel box was left there. The first time only appellant and McCloskey were present. On the second occasion appellant, McCloskey and his wife Harriet who had arrived that night from Seattle were present.

On the following day McCloskey told appellant that he would go down to pick up the checks from the jewelry store, and appellant said that he would have his suitcase packed and be ready to go. The appellant gave Harriet McCloskey a watch that morning. McCloskey and his wife drove to Weinstein Jewelry Company and McCloskey told his wife that if she saw him come out handcuffed she was "to take off."

McCloskey entered the jewelry store and a clerk introduced him to Sergeant Uribe of the Los Angeles Police Department who was there to check on the jewelry. The clerk asked McCloskey for identification. At this point McCloskey knew arrest was imminent and he left, leaving the jewelry and his identification.

McCloskey drove to his residence and upon meeting appellant said, "Come on, we got to get out of town; we are 'hot.'" Appellant, McCloskey and his wife then left in the McCloskey car, driving toward Las Vegas. Appellant rode as far as Mojave. Appellant handed Harriet McCloskey a lady's watch, a lapel watch, some little gold coins and a ring without a setting. Appellant had previously given Harriet McCloskey another watch before they left Los Angeles. The McCloskeys drove to Las Vegas where they stayed. Harriet McCloskey, under the name of "Harriet W. Mix," pawned a watch at a place called the "Hock Shop" in Las Vegas. This watch was recovered from the Hock Shop by a ticket found in the McCloskey car following their arrest.

After remaining a couple of days, the McCloskeys left Las Vegas and returned to Los Angeles. Upon their arrival in Los Angeles, Harry was arrested. At the time of his arrest he had a watch upon his person and in the car which he was

driving the police found a watch and a ring. The police also found three pawn tickets, two for watches and a ring in Los Angeles and one for a watch in Las Vegas.

Deputy Sheriff Joe Meyer of Napa County took appellant and DiGiorgio into custody. At the time of the arrest Officer Meyer asked DiGiorgio if he was willing to give a formal statement regarding the offense and he said he would not upon advice of his attorney. An objection to this testimony was made by counsel for DiGiorgio and overruled. Officer Meyer also had a conversation with appellant at which time he asked him if he would give a formal statement concerning the Noyes burglary. Appellant stated that he would not and further declared that he would "take his chances in court."

A search of appellant's personal belongings disclosed a business card printed as follows: "B and T Motors, William 'Bill' Duarte." This card had a pencil notation on the back as follows: "929 Third," and "313 Browns Vly." The address of the Noyes residence is 3131 Browns Valley Road in Napa. The address of Noyes Lumber Company in Napa is 929 Third Street.

Appellant did not testify in his own defense and offered no witnesses to refute the evidence introduced by the prosecution. Defendant DiGiorgio testified in his own behalf and also offered evidence of an alibi.

Appellant first contends that the trial court committed prejudicial error in failing to instruct the jury on its own motion in accordance with the rule enunciated in section 1111 of the Penal Code that a conviction cannot be had upon the testimony of an accomplice unless it is corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. Appellant argues that the witnesses, Harry McCloskey and his wife Harriet, would have been found to be accomplices of the appellant if this question had been submitted to the jury. We find no error of the trial court in failing to give such an instruction. It is clearly evident from the record that neither Harry nor Harriet McCloskey was an accomplice in the crime with which appellant was charged and of which he was convicted, i.e., burglary. There is no evidence in the record to support even an inference that the McCloskeys were involved in the burglary. The fact that Harry McCloskey knew that the jewelry he received from appellant had been stolen and pro-

ceeded to sell it for the appellant would not constitute him an accomplice. (*People* v. *Conerly,* 172 Cal.App.2d 682 [342 P.2d 305]; *People* v. *Malone,* 167 Cal.App.2d 400 [337 P.2d 217].)

In *People* v. *Raven,* 44 Cal.2d 523, 526 [282 P. 2d 866], the court said: ". . . It is settled that the thief and the one knowingly receiving stolen property from him are guilty of distinct and separate substantive offenses and are not accomplices of each other. [Citing cases.] An exception to the rule is recognized when the thief and the receiver conspire together in a prearranged plan whereby one is to steal and the other is to buy. [Citing cases.] . . ."

In the instant case there is no evidence of a prior arrangement between the appellant and the witnesses Harry and Harriet McCloskey. The uncontradicted testimony is that they were in Los Angeles when the burglary occurred and that Harry McCloskey did not even see the stolen articles until about a month later. Under the rule in the Raven case, *supra,* the fact that the McCloskeys received the jewelry knowing it to have been stolen did not make them accomplices of the appellant in the burglary. Thus no instruction on the corroboration of the testimony of an accomplice was required.

Appellant next contends that the trial court committed prejudicial error in giving an instruction as to the effect of possession of stolen property and the duty of one having such possession to explain that possession. The instruction in question reads as follows:

"The mere possession of stolen property, however soon after the taking, unexplained by the person having possession, is not sufficient to justify conviction. It is however, a circumstance to be considered in connection with other evidence in determining the question of innocence or guilt. If you should find from the evidence that a burglary was committed on the premises involved in this case and that thereafter the defendants were found in possession, or claimed to be owners, of property stolen from the burglarized premises, such a fact would be a circumstance tending in some degree to show guilt, although not sufficient, standing alone and unsupported by other evidence, to warrant your finding them guilty. In addition to proof of possession of such property there must be proof of corroborating circumstances tending of themselves to establish guilt. Such corroborating circumstances may consist of the acts, conduct, falsehoods, if any. or other

declarations, if any, of the defendants, and any other proved circumstance tending to show the guilt of the accused.

"If one is found in the possession of property that was stolen from burglarized premises, he is bound to explain such possession in order to remove the effect of that fact as a circumstance, to be considered with all other evidence, pointing to his guilt; and if he gives a false account of how he acquired that possession or, having reasonable opportunity to show that his possession was honestly acquired, he refuses or fails to do so, such conduct is a circumstance that tends to show his guilt."

Appellant concedes that the giving of this and similar instructions has been approved in a number of cases. However he contends that error was committed by the giving of the instruction in this particular case because he was not legally shown to have had possession of the stolen jewelry. He presumably bases this contention on the ground that the only testimony concerning his possession of the stolen property came from the lips of the witnesses Harry and Harriet Mc-Closkey. We have determined that neither Harry nor Harriet McCloskey was an accomplice in the burglary, hence their testimony was sufficient to establish the fact of appellant's possession. (*People* v. *Monteverde,* 111 Cal.App.2d 156 [244 P.2d 447].) The instruction in question contains a reference to the requirement that the jury find possession in appellant before they may treat such possession as an incriminating circumstance. The pertinent language of the instruction is: "*If you should find from the evidence* that a burglary was committed on the premises involved in this case, and *that thereafter the defendants were found in possession . . . of property stolen* from the burglarized premises, such a fact would be a circumstance tending in some degree to show guilt, . . ." (Emphasis added.) Further appellant asserts that "The overall effect of the instruction is to impose upon the defendant a duty to explain possession, while it ignores the important question of prior proof of that possession." There is no merit in this assertion. Nor does the case of *People* v. *Nichols,* 39 Cal.App. 29 [177 P. 861], support his position. The case of *People* v. *Monteverde, supra,* distinguishes the Nichols case *supra,* with respect to a similar argument raised by the defendant there. We quote from the Monteverde case, pages 170-171: " 'The court instructs you that where goods have been feloniously taken by means of a burglary, and either immediately or soon after are found in the possession of ? person who gives a

false account, or refuses to give any account, of the manner in which he came into the possession, proof of such possession and guilty conduct is presumptive evidence not only that he stole the goods, but that he made use of the means by which access to them was obtained.' Nothing of the kind was contained in the instruction here under attack. Moreover in the Nichols case the only testimony connecting the defendant with the burglary was that of a pawnbroker who had bought some of the stolen property from a man who looked like Nichols according to the pawnbroker. The Nichols case is not in point. . . .'' The instruction in question in the instant case contained a correct statement of the law and was properly given.

██ Appellant contends that the trial court erred in failing to instruct the jury as to the meaning of ''corroborating circumstances'' since the instruction regarding the duty of a person to explain possession of stolen property contained the words ''corroborating circumstances.'' He contends that section 1839 of the Code of Civil Procedure should have been communicated to the jury that corroboration is ''additional evidence of a different character, to the same point.'' While the statutory definition was not given in so many words, we are satisfied that the jury was substantially informed as to the meaning of corroborative evidence. On this question the court said: ''Such corroborating circumstances may consist of the acts, conduct, falsehoods, if any, or other declarations, if any, of the defendants, and any other proof of circumstances tending to show the guilt of the accused.'' Such language sufficiently clarified the term to permit the jury to reach a fair conclusion. Again the testimony of McCloskey and his wife to the effect that he (appellant) had possession after the crime was competent proof of that fact. The possession of the stolen property was sufficiently shown by the testimony of the receivers (the McCloskeys). (*People* v. *Monteverde, supra,* at p. 170.)

██ Appellant next contends that the trial court erred in admitting evidence of defendant's refusal to give the police a formal statement. We find no merit in this contention. Officer Meyer asked appellant upon his arrest if he would give a formal statement concerning the burglary and appellant stated that ''he would not'' and that ''he would take his chances in court.'' The appellant made no objection to this specific evidence, but just prior to its receipt defense counsel had objected to similar evidence against codefendant DiGior-

402

gio, which objection was overruled. ". . . Accusatory statements and the responses thereto are admissible under a well-recognized exception to the hearsay rule. As stated in *People* v. *Davis*, 43 Cal.2d 661, 670 [276 P.2d 801], 'If the accused person expressly admits the truth of the accusatory statement, both the statement and answer may be admitted. If the accused person expressly denies the accusatory statement, there is no admission. If the accused makes an evasive or equivocal reply which is not directly responsive to the accusatory statement, or remains silent, it has been held that under certain circumstances both the accusatory statement and the response are admissible.' Each case must be determined on its own facts." (*People* v. *Davis*, 48 Cal.2d 241, 249-250 [309 P.2d 1]; see also *People* v. *Wein*, 50 Cal.2d 383, 401-402 [326 P.2d 457]; *People* v. *Bernstein*, 171 Cal. App.2d 279, 282-283 [340 P.2d 299].)

 We find no admission here as to the question and answer. The question was not directly accusatory; nor was the answer, "he would not," followed by the added comment that "he [defendant] would take his chances in court," evasive or equivocal. Although it should have been excluded had timely objection been made, we nevertheless feel that appellant suffered no prejudice. Further, it is not subject to attack on appeal since no objection was made to the question at the trial, nor was any motion made to strike or limit its effect. "It is the rule that unless objection to it is made at the trial such evidence is beyond attack on appeal and may be considered in support of the judgment. [Citing cases.]" (*People* v. *Simmons*, 28 Cal.2d 699, 723 [172 P.2d 18]; see also *People* v. *Wein, supra.*)

Lastly, the appellant contends that the evidence is insufficient to support the judgment. After having read the entire record in the case we find no merit in this contention.

The judgment is affirmed.

Van Dyke, P. J., and Schottky, J., concurred.