THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JAMES NEELEY, JR., Defendant-Appellant.

Fifth District    No. 79-203

Opinion filed October 24, 1980.

John H. Reid, of State Appellate Defender's Office, of Mt. Vernon, and E. Joyce Randolph, law student, for appellant.

Clyde L. Kuehn, State's Attorney, of Belleville (Martin N. Ashley and Gillum Ferguson, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE KASSERMAN delivered the opinion of the court:

Defendant, James Neeley, Jr., was convicted of the offense of burglary by a jury in the Circuit Court of St. Clair County and was sentenced to a term of imprisonment of five years. On appeal defendant challenges the competency of his court-appointed counsel.

Christine Winston testified at defendant's trial that she was at home on September 28, 1978, when she heard an automobile motor idling and a dog barking in the vicinity of the home of a neighbor, Frederick Boyd. She estimated the time to be approximately 3 p.m., because she was expecting her daughter to arrive home from school shortly. Looking out a window

she observed an automobile parked beside Boyd's house. She saw four men, all who were short and of average build, carry objects from the house and load them into the automobile. She was able to ascertain the make and model of the vehicle and noticed that it bore Missouri license plates. While telephoning a police dispatcher concerning a possible burglary, she continued to watch the men as they drove away heading east. She relayed to the dispatcher details about the automobile, its license plates, the number of men she saw and what they were doing at the Boyd residence.

Jerry McHenry, a patrolman for the East St. Louis Police Department, testified that he was on duty on September 28 when he received a dispatch at 3:18 p.m., concerning a 1972 green Buick with Missouri license plates which was suspected of being involved in a burglary at a nearby home. Immediately thereafter, he saw a vehicle matching the description stopped in traffic at an intersection. He followed the vehicle and radioed for help.

Another patrol car eventually pulled the Buick over, and an Officer Pritz asked one Yates, who was apparently the driver of the car, to open up the trunk. Yates replied that the officer could open it. Once Officer Pritz got the keys, he opened the trunk and found a television set and a stereo component set there. Another television set was found in the back seat of the car. Officer McHenry identified defendant as one of the four occupants of the vehicle.

Frederick Boyd testified that neither he nor his wife were at home that day and that the doors to the house were locked as usual. When he returned home that afternoon, he found the police were there and noticed two stereo component sets and two television sets missing. Boyd observed that the kitchen window was open and slightly damaged, as if something had been used to pry it up.

The last State's witness was Detective James W. Cowan, who conducted interviews of each of the four men regarding the burglary. Defendant was the last to be interviewed; and after he had initialed a *Miranda* rights acknowledgement form, he told Detective Cowan that he would be willing to make a statement. Defendant then told Cowan that he was living in St. Louis, Missouri, and that Thomas Davis had picked him up there. They then went to Arthur Treacher's restaurant in East St. Louis, Illinois, and were riding around in Davis' automobile afterward when they saw a house and decided to break into it. After Detective Cowan had put that information in statement form, defendant read and signed it. According to Cowan, defendant told him that he had family in East St. Louis and neither denied that he had participated in the burglary nor claimed that he was with his family at the time. At the conclusion of Cowan's testimony defendant's signed statement was read to the jury.

Defendant denied any involvement in the burglary. He testified that he saw his co-defendants, Yates, Davis, and Bland around noon on September 28, 1978, in St. Louis. He got into their automobile and drove into East St. Louis with them because he wanted to see his stepmother, Julia Bolden, who lived on Martin Luther King Drive. He claimed that he wanted to see her because he had just been released from prison in Missouri. According to defendant, the men first went to an Arthur Treacher Restaurant in East St. Louis, where defendant completed a job application and talked to Davis' uncle, who was the manager. The other three then dropped defendant off at his stepmother's house and drove away, saying they would be right back. The defendant stayed about an hour, talking to his stepsisters and stepbrother. His stepmother was at work, but she telephoned during this time. The three men returned about 3 p.m., and offered defendant a ride back to St. Louis. After defendant got in the car, he saw the television set and asked Davis where he got it. Davis told him that he had obtained it from his "partner," and nothing more was said.

Defendant asserted that at the police station he initially told Detective Cowan that he knew nothing about the burglary. Defendant kept insisting that he was innocent, whereupon Detective Cowan said, "You must want to go into my back room." Defendant testified that Cowan then struck him on the head and called in two guards, who took him into another room, then beat and cursed him for a period of about 30 to 35 minutes. Defendant admitted that he subsequently signed the statement produced by Cowan but denied knowing that it was a confession; instead, he signed it because Detective Cowan told him it was a property slip and because of the beating and harassment. He related that the statement was not read to him nor did he read it himself. He denied telling Cowan that he had been involved in the burglary and instead told Cowan about going to Arthur Treacher's and visiting his stepmother's house.

On cross-examination the following colloquy occurred between defendant and the State's Attorney:

"Q. Okay, now we are getting at the accurate version. He hit you right here and then he handed you these documents which you thought were property slips and you signed them and then the two guards were brought in and beat you for 35 minutes in the back room after you signed this document, is that what you are saying?

A. Yes, sir."

Defendant also testified that his stepmother had visited him once while he was in the penitentiary and that his visit to his stepmother's house on the day of the burglary was his first visit there since his release from prison.

After the defense rested its case, the State called defendant's stepmother, Julia Bolden, as a rebuttal witness. She denied ever visiting defendant at the penitentiary, and recalled that he had visited her twice at her home after his release, the first time in late August and the second in early September. Upon further examination, she admitted that it was "very possible" that she had called home once thereafter and talked to him. However, she could not recall specifically.

Detective Cowan, also called in rebuttal by the State, stated that defendant read the written statement before signing it and he had never been told that he was signing property slips. Cowan testified that he did not strike defendant and that no one else was present in the interrogation room where defendant's statement was taken.

A verdict of guilty for the offense of burglary was returned by the jury. Defendant urges ineffective assistance of counsel on appeal.

■■ Incompetency of court-appointed counsel will be established by a showing of actual incompetence on the part of counsel in carrying out his duties as a trial attorney which results in substantial prejudice to defendant without which the outcome would probably have been different. (*People v. Thompson* (1978), 66 Ill. App. 3d 141, 383 N.E.2d 690; *People v. Goerger* (1972), 52 Ill. 2d 403, 288 N.E.2d 416.) Mistakes in strategy or judgment do not render a trial attorney's representation incompetent. (*People v. Atkins* (1980), 81 Ill. App. 3d 661, 402 N.E.2d 383.) Only where trial counsel's conduct is of such defective character as to make the defense a sham or a farce is there a denial of the defendant's right to effective assistance of counsel. (*People v. Dean* (1964), 31 Ill. 2d 214, 201 N.E.2d 405.) Finally, it is relevant to the question of effectiveness of counsel that the evidence so overwhelmingly points toward the guilt of the accused that there could be little effective defense available. *People v. Wesley* (1964), 30 Ill. 2d 131, 195 N.E.2d 708.

■■ Defendant initially charges his trial counsel with incompetence for failing to file a motion to suppress his confession which he contends was coerced through physical abuse and deception perpetrated by police interrogators. Although a form motion to suppress the confession was filed over the name of the public defender, it was not pursued by any of the assistant public defenders variously assigned to the case. As a result, the issue of the voluntariness of the confession was not litigated before the trial court but before the jury instead. Defendant asserts that due to the jury's preoccupation with determining guilt or innocence it lacked the sophistication necessary to rule on the voluntariness of the confession and, once having determined the confession to be involuntary, not to rely on the confession in deciding the case. Since defendant perceives the confession to be an integral element of the State's case, he concludes that the failure to challenge the admissibility of the confession before the trial

court in the guise of a motion to suppress constituted ineffective assistance of counsel.

The determination of the voluntariness of a confession is "an exceedingly sensitive task, one that requires facing the issue squarely, in illuminating isolation and unbeclouded by other issues and the effect of extraneous but prejudicial evidence. [Citations.]" (*Jackson v. Denno* (1964), 378 U.S. 368, 390, 12 L. Ed. 2d 908, 923, 84 S. Ct. 1774, 1788.) For this reason the Supreme Court in *Jackson* held as a matter of due process that the issue of voluntariness be decided by the trial court outside the jury's presence. It is the fundamental protection which was denied defendant due to his appointed counsel's failure to secure a hearing on the admissibility of the confession prior to trial or during trial outside the presence of the jury when the allegation of coercion became evident through defendant's testimony. We find *People v. Odom* (1966), 71 Ill. App. 2d 480, 218 N.E.2d 116, apposite to the instant case. In *Odom*, as here, the critical evidence offered by the State at trial was a confession obtained shortly after defendant was taken into custody. After prosecution testimony regarding the confession was introduced, Odom took the stand and explained that he had been coerced and tricked into signing the prepared statement. In holding the public defender ineffective for, *inter alia*, failing to obtain a pretrial ruling on defendant's allegations, this court stated:

"The public defender exercised none of the preliminary procedures available to him prior to trial. The case was brought to trial on February 5, 1964, some three months after the public defender's appointment to represent him. During that entire time both client and attorney were in the same city, the former being confined in the county jail where he was always available for consultation. Despite this fact, his attorney failed to file a motion to suppress the confession under provisions of Ill. Rev. Stat. 1963, Ch. 38, Sec 114—11. Such a motion would have required the State to sustain the burden of satisfying the court that the confession was given voluntarily if such was to be used in evidence at trial. Due process requires that a coerced confession be excluded from consideration by the jury, and a defendant has a constitutional right to object to the use of a confession and to have a fair hearing on the issue of voluntariness, uninfluenced by the truth or falsity of the confession. *Jackson v. Denno*, supra. But in the instant case defense counsel made no effort to exclude the confession despite the fact that he must have known, if he conferred at all with his client or his client's wife, that serious question existed as to the voluntariness of the confession. In so doing he gave his client no protection whatsoever against being convicted on the basis of a

coerced confession. To compound the offense, no instruction was even given to the jury to disregard the confession if it found that it was given involuntarily. Even if this were done, the United States Supreme Court's holding in *Jackson v. Denno,* supra, would condemn the conviction for:

> 'Due process of law requires that * * * the issue of coercion be tried by an unprejudice [sic] trier * * * it is useless to contend that a juror who has heard the confession can be uninfluenced by his opinion as to the truth or falsity of it * * * . And the rule of exclusion ought not to be emasculated by admitting the evidence and giving to the jury an instruction which * * * cannot be obeyed.' " 71 Ill. App. 2d 480, 484-85, 218 N.E.2d 116, 118.

Here, as in *Odom,* the public defender emasculated Mr. Neeley's critical contention that the confession in question was involuntary. In addition to the error in *Odom,* counsel in the case at bar inexcusably failed to tender, and the court did not give, any limiting instruction for the jury. (See Illinois Pattern Jury Instructions, Criminal, No. 3.07 (2d ed. 1971) (hereinafter cited as IPI Criminal).) Accordingly, defendant was denied this most basic due process safeguard.

■■ Defendant cites his counsel's closing argument as another example of ineffective assistance of counsel. Defendant asserts that during closing argument defense counsel assumed the role of an impartial observer rather than that of an aggressive advocate. As a result of counsel's performance, defendant charges that he was abandoned by his attorney. We agree.

Defendant takes particular offense at the following statements:

> "[Mr. Grotts]: In his own defense he testifies that that statement was more or less forced out of him, that he was beaten at the police station and that he signed it thinking it was a property receipt. He also testified that he did not know that was a confession. Those four pieces of paper that he signed down at the police station he thought were property receipts. At the time of the burglary he was at the home of his step mother [sic]. Her name is Julia Bolden. She testified here. She lives at 1404 Martin Luther King Drive in East St. Louis. He said that was the first time he had gone over to see her since he had been released from the penitentiary on August the 7th and that she was not at home but she called while he was there and he talked to her. He also talked to his step brother [sic] and step sister [sic] who did not testify. She testified that actually he had come to see her a couple of times before that after he was released from the penitentiary and she doesn't recall whether she was at home or not. She testified on behalf of the State rather than

the defendant. This is the nature of the testimony. This leaves several questions unexplained; if the defendant were [sic] not in the car at the time the burglary occurred, why were there four people identified as being involved in the burglary; where did the fourth missing person go; did he really think that was a property receipt? If he was really over at his step mother's [sic] house for the first time since after his release from the penitentiary, why did she say he had been there before, and I am sure there are other questions that are raised from the evidence in this trial during the last day and a half. The defendant, in a criminal case, does not have to prove anything; he does not have to testify and when a defendant does testify, he is open to what is known as impeachment by his prior criminal record which was brought out and that is supposed to be considered to the extent that it may be considered to the extent that it may effect [sic] his truthfulness on the witness stand and that is the law and you are free to accept that for what it is worth. Would he be telling the truth, and the fact that he has been convicted of a felony before effect [sic] his credibility as a witness in a courtroom. Ladies and gentlemen, you may have heard all of the evidence now and there is very little that I can add to it and I would simply ask you to return a fair verdict in this case and I am sure that whatever your verdict is, it will be fair. Thank you very much."

We find the direction of counsel's argument on behalf of defendant to be beyond mere error in strategy. The prosecutor, for his part, had not mentioned the details in which Julie Bolden's testimony had differed from defendant's, nor had the prosecutor commented that she had testified for the State. Additionally, the State had not yet argued defendant's prior conviction as a tool of impeachment. The depth with which these subjects were referred to by defense counsel seemed to go beyond the level necessary to blunt similar statements which may have been made by the prosecutor in his final closing argument. Counsel's additions to the State's case were exacerbated by the open-ended questions posed to the jury, each of which suggested an answer consistent with defendant's guilt. Notably absent from counsel's argument was any attack upon the weaknesses of the State's · case, any suggestion of defendant's innocence and any request that defendant be acquitted. The net effect of counsel's closing argument was to abdicate defendant's position, thus denying defendant effective assistance of counsel. See *People v. Carter* (1976), 41 Ill. App. 3d 425, 354 N.E.2d 482.

We hold that defense counsel's failure to actively pursue the motion to suppress the confession and counsel's abandonment of defendant during closing argument constitute actual incompetence. Due to the

importance of the confession to the State's case and the prejudicial impact of the closing argument, we cannot say that had there been no incompetence, the outcome of trial would have been the same. Accordingly, we reverse the judgment of the circuit court of St. Clair County entered on the guilty verdict and remand this cause for a new trial.

Reversed and remanded.

HARRISON and SPOMER, JJ., concur.