[Crim. No. 12485. Third Dist. Feb. 24, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES STEVEN DIGGS et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II, III and IV.

**COUNSEL**

Joseph L. Staats, under appointment by the Court of Appeal, Krech & Cole and Richard J. Krech for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Robert D. Marshall and Michael T. Garcia, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SIMS, J.**—In this case, we must reverse the judgment because both defendants were prejudiced by a bizarre, incompetent closing argument made to the jury by defendant Colbourn's counsel. In an unpublished portion of the opinion, for the benefit of the trial court on retrial, we consider and reject certain other claims of error asserted by defendants.

### FACTUAL AND PROCEDURAL BACKGROUND

The People's evidence was as follows:

At approximately 8 p.m. on February 16, 1982, the victims in this case, Kathy R. and Kristen B. wanted to visit a friend and began hitchhiking in Sacramento. They were picked up by a vehicle occupied by defendants Diggs and Colbourn, and Colbourn's brother. At Kristen's request, they stopped to buy a six-pack of beer and cigarettes.

Defendants then drove to a friend's house, where Colbourn took a syringe out of the dashboard. Defendants went into the house while the women waited in the car for about 20 minutes.

Defendants returned to the car and, after stopping at a gas station to let Kathy go to the bathroom, they drove about 20 minutes to defendant Colbourn's mobilehome.

There, the two women listened to music, drank beer, smoked marijuana, and talked with defendants and Colbourn's two brothers. Kathy asked to be taken home when one of the Colbourn brothers asked her how big her bust was. Defendants and the two women then left in a vehicle driven by Diggs.

Kathy demanded to be taken home. However, Diggs ultimately drove the car to a remote area. On the way, Diggs obscenely threatened the women with harm if they did not engage in various sexual acts. At one point, Colbourn grabbed Kathy's crotch and slapped her when she would not further cooperate.

Kathy was let out of the car to go to the bathroom and ran into the darkness. Kristen tried to get out of the car, but defendants would not let her. The three drove to a very isolated area.

There, defendants forcibly removed Kristen's clothes.

With Colbourn's help, Diggs tried to rape Kristen but was unable. Defendants tried to make Kristen orally copulate Diggs, but she refused; Diggs orally copulated her.

Thereafter, defendants tried to make Kristen orally copulate Colbourn on four occasions, but each time she refused.

Diggs succeeded in raping Kristen once; Colbourn did so twice. Kristen was crying. Colbourn struck her when she refused to orally copulate him.

Finally, Diggs announced that he needed to leave because he had a court appearance in the morning. Diggs turned the car around and drove into a ditch.

Colbourn wasn't finished with Kristen and wanted to stay until morning. Diggs left on foot to procure aid. While he was away, Colbourn again tried to make Kristen orally copulate him. She refused, pushed him away, and got into the front seat where she put on her clothes. Colbourn again made advances but Kristen pushed him away and got out of the car. She ran to the nearest driveway. Colbourn caught her, hit her on the side of the head and pulled her by the hair back to the car.

Diggs returned and, at Kristen's suggestion, all three went toward the houses on the road for help with the car. Diggs gave Kristen his jacket and apologized, stating "he had done something wrong, that he regretted it."

The three went to the house of Benjamin D. Diggs offered him $20 to pull the car out of the ditch, or in the alternative, to call a tow truck. Benjamin D. said he would call a tow truck and closed the door. In fact, he called the police.

When Benjamin D. opened the door again Kristen said, "Help me, please. Don't let these guys hurt me again." Kristen grabbed onto a porch railing. Benjamin D. saw Colbourn hit Kristen in the head and stomach a number of times. Diggs and Colbourn could not get Kristen to let go and left. Benjamin D. then let Kristen into the house.

Diggs and Colbourn contacted another nearby resident, Virgil P., who agreed to help them tow out Colbourn's car. As they approached their vehicle a sheriff's vehicle was parked nearby. Diggs and Colbourn told Virgil P. they didn't want to speak to authorities and requested to be taken to a phone to call a tow truck.

Headlights followed Virgil P.'s vehicle. Diggs and Colbourn got out of the car quickly and ran.[1]

Kristen was taken for a medical examination. It disclosed a bruise on the shoulder; tenderness, redness and swelling on the right side of the head; scrape on the left hip; four red marks on the back; tenderness of the jaw; and trauma-caused redness of the external genitalia. Semen was found in her vagina.

Diggs testified in his own behalf. His version of the events did not differ significantly until the four left Colbourn's home in the vehicle driven by Diggs. Colbourn suggested that they go to Rio Linda, so they would not have to worry about being harassed by anybody. This suggestion drew no objection from either Kathy or Kristen.

Diggs continued driving towards Rio Linda for 30 minutes. In the course of the trip all four occupants of the vehicle were drinking beer and smoking marijuana. Upon reaching Rio Linda, Diggs parked the car because he was tired of driving around. He backed up the vehicle into a cattle chute to keep the car out of the path of oncoming traffic.

As they sat in the vehicle drinking, Kathy left to relieve herself and was gone about five minutes. Kathy got back into the car and began kissing Colbourn. Kristen, meanwhile, told Diggs that she liked him and wanted to be with him, and said, "Maybe we can get something together." Kathy then said that she had to relieve herself again. She gave Colbourn a kiss that lasted 20 or 30 seconds and then got out of the car and did not return.

Diggs, concerned about Kathy, drove slowly around the area, looking for her, then returned to the original parking place. Diggs, Kristen, and Colbourn waited another 15 minutes for Kathy and left. At a place approximately two and a half miles from the original parking place, Kristen asked Diggs to pull over and said, "Why don't you have [Colbourn] . . . get out of the car so we [can] be by ourselves." After Colbourn left, Diggs and Kristen got undressed. They then engaged in consensual sexual intercourse for five minutes. Diggs testified that he and Kristen did not orally copulate each other and that he never threatened Kristen. At no time did Kristen exhibit any resistance to Diggs.

After completing the act of intercourse Diggs and Kristen dressed. Colbourn returned to the vehicle and Diggs took a walk for five minutes and returned.

---

[1]The probation report indicates defendants were arrested when they appeared the next day at the Roseville Police Department to find out if any complaint had been made.

Diggs had no knowledge of what, if anything, occurred while he was away.

Diggs admitted that Colbourn slapped Kristen in front of Benjamin D.'s house but did so to calm her down, because, although she was fine at the car, she had "just flipped out."

Diggs also admitted telling Virgil P. to avoid a sheriff's car but did so because he was late in paying a traffic fine and had other traffic violations.

Colbourn's defense is discussed later in the opinion.

Defendants were charged in a multiple count information with the following offenses against Kristen: kidnapping (Pen. Code, § 207—count 2);[2] oral copulation by force, in concert (§ 288a, subd. (d)—count 3); four counts of attempted oral copulation by force, in concert (§§ 288a, subd. (d), 664—counts 4, 5, 7 & 10); and three counts of rape, in concert (§§ 261, subd. (2), 264.1—counts 6, 8 & 9). Colbourn was also charged with assault with intent to commit rape against Kathy. (§ 220—count 1).

On count I Colbourn was convicted of the lesser included offense of simple assault. Both defendants were convicted on the remaining counts as charged. Each defendant was sentenced to a total unstayed term of 17 years and 6 months in state prison.[3]

## DISCUSSION

### I

Defendant Colbourn contends the judgment must be reversed on all counts because his retained counsel, Howard Welch of Auburn, provided legally ineffective assistance of counsel, most particularly in Welch's closing argument to the jury.[4] Defendant Diggs contends Welch's ineffectiveness prejudiced him to the extent that the judgment as to him must be reversed as well. Regrettably, we must agree with these contentions.

---

[2] All further statutory references are to the Penal Code unless otherwise indicated.

[3] Colbourn was sentenced to a concurrent term of one year in the county jail on count 1. According to the probation report, each defendant was 20 years old at the time of sentencing. Both had committed theft-related offenses as juveniles. As adults, Colbourn had accumulated four or five misdemeanor drunk driving convictions and Diggs had been convicted of a single misdemeanor offense.

[4] Defendant Colbourn's opening brief incorporates by reference the arguments presented in his petition for habeas corpus No. 3 Crim. 14420, which was denied by this court on May 10, 1985. We take judicial notice of the arguments therein presented.

We turn first to the testimony of defendant Colbourn that set the stage for the closing argument in question.[5]

On direct examination,[6] attorney Welch first referred to the syringe that Colbourn had taken out of the dashboard of the car and asked Colbourn to "explain what happened then in that respect because it has been discussed and clarify it." Colbourn "clarified" the point by testifying that he had delivered marijuana to his friend's house in a trade for amphetamines and that, while in the house, with the women waiting in the car, he had injected himself with amphetamine.

Welch then elicited testimony that everyone in the car drank beer traveling from his friend's house to Colbourn's mobile home. At the trailer, defendant drank more beer. Describing the effect of the beer and amphetamine, defendant testified "you just kind of are at a level, not really up or down, so you are at a space level like." Also, "I was pretty loaded."

Welch then asked Colbourn, "Was there any resistance on the part of [Kristen] to your aggressive sexual attitude that you may have had?" and defendant answered, "No, there wasn't."

Welch then elicited testimony that Colbourn could not get an erection, a circumstance that "teed me off a little bit or maybe kind of freaked out or something."

After showing Colbourn a handwritten note which Colbourn could not identify, Welch then ended his direct examination.

The status of Colbourn's defense following this examination was as follows: since Colbourn had not testified that intoxication had interfered with

---

[5]"Putting all of the above into proper perspective is going to entail a distressingly time-consuming examination of the record and a resulting opinion of unconscionable length. Readers not particularly interested in this field of law would be well advised to flip over to the next case in the advance sheets." (*People* v. *Huffman* (1977) 71 Cal.App.3d 63, 68 [139 Cal.Rptr. 264], opn. by Gardner, P. J.)

[6]Welch's direct examination of Colbourn was relatively brief. It consumes 10 pages of a trial transcript of more than 1,200 pages; much of the 10 pages is taken up with objections such as the following:
"Q. [MR. WELCH] Are you registered to vote?
"MR. COZENS: Objection, irrelevant.
"THE COURT: Sustained.
"Q. [MR. WELCH] I want to be sure—so you are twenty years old, and I take—is that all right to ask him whether he's registered to vote? He's eighteen though, he can register.
"THE COURT: I sustained the objection.
"MR. WELCH: Oh, I am sorry.
"THE COURT: It is irrelevant as to whether he is registered to vote.
"MR. WELCH: Sometimes age is proven by their actions."

his forming any mental state necessary for the commission of any offense, any defense based on voluntary intoxication[7] was "undeveloped." (*People v. Frierson* (1979) 25 Cal.3d 142, 159 [158 Cal.Rptr. 281, 599 P.2d 587]; see *People v. Flannel* (1979) 25 Cal.3d 668, 685-686 [160 Cal.Rptr. 84, 603 P.2d 1].) Similarly, Colbourn's only articulated defense to the numerous "in-concert" crimes alleged against both Diggs and him was his single answer that Kristen did not resist his "aggressive sexual attitude" and his confirmation that he could not get an erection. Colbourn was not asked, and did not explain, whether he had engaged in the various sex crimes charged nor what, if anything, Diggs did nor whether Colbourn helped him. Thus, Colbourn's testimony on direct examination left him with no defense based on voluntary intoxication nor any defense to the charges of attempted oral copulation, nor any defense to the "in-concert" crimes involving Diggs as the perpetrator. At most—and giving the testimony every benefit of doubt—Colbourn's testimony tendered a defense only to charges of forcible rape in which he was the alleged perpetrator, based on lack of consent and lack of penetration.[8]

Apparently recognizing this state of affairs, and what it portended for his client, counsel for Diggs then took Colbourn on an extensive but sympathetic cross-examination. Boiled down to its essentials, Colbourn's testimony was that the girls were willing party participants, that they all consumed beer and marijuana, that they made no objection to parking, and that Kathy had let him kiss her. Kathy got out of the car to go to the bathroom and never came back.

Diggs, who was with Kristen, then "just kind of smiled at me and asked me to get out of the car." Colbourn took a walk and returned about 10 minutes later. Diggs got out of the car and Colbourn believed Diggs and Kristen had not had intercourse because it would have taken longer. Kristen was dressed, sitting on the front seat. They drove the car from the scene but got stuck in a ditch. Diggs left to get a tow truck, and Colbourn attempted a consensual act of intercourse with Kristen but could not get an erection. Diggs returned and the three went to a mobilehome to get help.

---

[7]At the time of the crimes at issue, Penal Code section 22 provided in pertinent part: "(b) Whenever the actual existence of any mental state, including, but not limited to, purpose, intent, knowledge, or malice aforethought, is a necessary element to constitute any particular species or degree of crime, evidence that the accused was voluntarily intoxicated at the time of the commission of the crime is admissible on the issue as to whether the defendant actually formed any such mental state." (Stats. 1981, ch. 404, § 2, p. 1592.)

The statute was subsequently amended. (See Stats. 1982, ch. 893, § 2, p. 3317.)

[8]The quid pro quo for the examination that produced this skeletal defense was Colbourn's disclosure of the damaging facts that he was a trafficker in narcotics, that his sexual attitude had been "aggressive," and that he was "teed off" or "freaked out" by his inability to get an erection.

Colbourn slapped Kristen at the mobile home when she "was freaking out" to try to calm her down. Other than that incident, he did not inflict any physical abuse on Kristen.

Colbourn testified he did not have sexual intercourse with anybody that night nor did he have any knowledge of anyone else having intercourse.

Under cross-examination from the prosecutor, Colbourn denied ever asking or attempting to make Kristen orally copulate him. Colbourn admitted he had a vivid memory of the events at issue, that he knew it would have been wrong to force Kristen to engage in sex, and that he would not have done anything that was wrongful. He expressly admitted that, despite his consumption of drugs and alcohol, he could conform his conduct to the requirements of law. He also testified he had not listened to any music that night that had suggested he participate in sexual intercourse, nor was he "under the influence of . . . rock and roll songs . . . ." Colbourn also said he had not watched television that night and nothing he saw on television could have suggested that he behave in a certain way.

By the conclusion of cross-examination, Colbourn's only viable defense was clearly established: denial of participation in any forcible sex acts and denial of any knowledge of such acts by Diggs. His voluntary intoxication defense, which had been "undeveloped" at the conclusion of his direct testimony, had been eliminated altogether by his admissions made upon cross-examination.

Welch then conducted a redirect examination of Colbourn, which is set forth in its entirety in appendix A, *post,* wherein he asked Colbourn about music he listened to and television shows he watched. Shortly thereafter, Welch gave his remarkable closing argument which defies summary description and which is therefore set forth in its entirety in appendix B, *post.*

Welch's argument is largely incoherent. To the extent it is comprehensible, it appears to argue that a "permissive" society in general—and television and rock music in particular—produce a nihilistic attitude in young people so that society should be held responsible for defendants' conduct. However, California does not recognize a defense to crime based upon the influence of "permissive" society generally, or rock music or television in particular, upon adult defendants.[9] The argument thus tenders a nondefense to the jury.

---

[9]Even if it did, Colbourn testified he was not influenced by music or television on the night in question and no evidence suggested he was.

Despite Colbourn's denials of criminal activity, the thrust of Welch's argument implicitly concedes Colbourn's participation and asks the jury to excuse it based on the societal theories previously alluded to. Indeed, at points, Welch expressly admits that both defendants participated in the charged crimes. Thus, referring to testimony that Colbourn was "slapping the girl around," Welch admits the veracity of the testimony,[10] tells the jury Colbourn "became, attitudewise, a problem, you see," and suggests to the jury, "We have to have a solution, because he's got a good sense of humor, and he's got good brothers." Welch then admits "attempts were made of oral copulation, things like that . . . ." At another point, Welch admits the victim resisted oral sex and states, "I admire the little girl who resisted. [¶] You see, she resisted this, and it is the way to do it." At the end of his argument, in a particularly incoherent passage, Welch, purporting to quote "Lady Campbell" states, "I am for sex, but let's keep it confined to the home. Don't let it out on the street and scare the horses, and I think we scared the horses today in this proceeding. [¶] But there is nothing we can do about it."

Except for his denial that defendants kidnapped the victims, Welch did not argue his client's only defense supported by the evidence: denial of criminal activity. Rather, Welch's argument admitted defendants' participation in the crimes and asked the jury to consider a nondefense by way of excuse.

■ We apply the following rules to determine whether Welch's argument meets minimal standards of competence:

The right to the assistance of counsel in a criminal case is guaranteed by the Sixth Amendment to the Constitution of the United States and by article I, section 15 of the California Constitution. (*People* v. *Frierson, supra,* 25 Cal.3d at p. 162; *People* v. *Pope* (1979) 23 Cal.3d 412, 422 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) A defendant is entitled to a reasonably competent attorney acting as a diligent, conscientious advocate. (*People* v. *Pope, supra,* 23 Cal.3d at p. 424.) Although the fact that counsel is privately retained is an important consideration in measuring the effectiveness of counsel's representation, *Pope*'s standard of effectiveness of counsel applies to both appointed and retained counsel. (*People* v. *Frierson, supra,* 25 Cal.3d at p. 162; see *People* v. *Corona* (1978) 80 Cal.App.3d 684, 703 [145 Cal.Rptr. 894].)

■ "Of course, the burden of proving a claim of inadequate trial assistance is on the appellant. [Citation.] Thus, appellant must show that trial

---

[10]Of course, Colbourn testified he slapped the victim only once at the conclusion of the episode when she was "freaking out."

counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates. In addition, appellant must establish that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense."[11] (*People* v. *Pope, supra,* 23 Cal.3d at p. 425.) A potentially meritorious defense is not one that is reasonably likely to succeed; rather, it is one that is crucial to the defendant. (*People* v. *Corona, supra,* 80 Cal.App.3d at p. 723; see *People* v. *Pope, supra,* 23 Cal.3d at p. 425, fn. 15.)

"Once an appellant has met these burdens, the appellate court must look to see if the record contains any explanation for the challenged aspect of representation. If it does, the court must inquire whether the explanation demonstrates that counsel was reasonably competent and acting as a conscientious, diligent advocate. For example, where the record shows that counsel's omissions resulted from an informed tactical choice within the range of reasonable competence, the conviction must be affirmed. [Citation.] In contrast, where the record shows that counsel has failed to research the law or investigate the facts in the manner of a diligent and conscientous advocate, the conviction should be reversed since the defendant has been deprived of adequate assistance of counsel. [Citation.]." (*Pope, supra,* 23 Cal.3d at pp. 425-426.)

■ The right to counsel guaranteed by the Sixth Amendment to the federal Constitution includes the right of counsel to make a closing argument in a criminal case.[12] (*Herring* v. *New York* (1975) 422 U.S. 853, 859, 865 [45 L.Ed.2d 593, 599, 602, 95 S.Ct. 2550].) "It can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. For it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole. Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions. And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt. [Citation.] [¶] The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted

---

[11]In *People* v. *Fosselman* (1983) 33 Cal.3d 572 [189 Cal.Rptr. 855, 659 P.2d 1144] the court broadened this test to allow defendants to obtain reversals of convictions where counsel failed to perform with reasonable competence and it is reasonably probable a determination more favorable to defendant would have resulted in the absence of counsel's failings. (P. 584.) Since *Pope*'s test controls the instant case, we have no occasion to examine *Fosselman.*

[12]The California constitutional provision (art. I, § 15) is undoubtedly in accord. (See *People* v. *Pope, supra,* 23 Cal.3d at p. 422, fn. 12.)

and the innocent go free. In a criminal trial, which is in the end basically a factfinding process, no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment." (*Id.,* at p. 862 [45 L.Ed.2d at p. 600].)

■ Closing argument may be waived in an appropriate case as a matter of tactics. (*People* v. *Gaines* (1962) 58 Cal.2d 630, 635 [25 Cal.Rptr. 448, 375 P.2d 296]; *People* v. *Espinoza* (1979) 99 Cal.App.3d 44, 48 [159 Cal.Rptr. 803].) However, having chosen to make a closing argument, counsel cannot argue against his client. (See *People* v. *Lang* (1974) 11 Cal.3d 134, 139 [113 Cal.Rptr. 9, 520 P.2d 393], and authorities cited therein; *People* v. *Davis* (1957) 48 Cal.2d 241, 256-257 [309 P.2d 1]; *People* v. *Cropper* (1979) 89 Cal.App.3d 716, 720-721 [152 Cal.Rptr. 555].) More particularly, unless his client consents, counsel cannot expressly or impliedly argue to the jury that his client is guilty. (*People* v. *Davis, supra,* 48 Cal.2d at pp. 256-257; *People* v. *Robinson* (1979) 70 Ill.App.3d 24 [387 N.E.2d 1114, 1116-1117].) It has been held that where counsel fails to argue in support of evidence showing a lawful defense, and instead argues a theory not recognized as a lawful defense, and upon which the jury will receive no instructions, counsel has incompetently deprived his client of a potentially meritorious defense and has effectively conceded his client's guilt. (See *People* v. *Bell* (1979) 48 N.Y.2d 933, 425 N.Y.S.2d 57 [401 N.E.2d 180, 181]; *Oesby* v. *United States* (D.C.App. 1979) 398 A.2d 1 [6 A.L.R.4th 1]; *People* v. *Robinson, supra,* 387 N.E.2d at pp. 1116-1117; see generally Annot. Adequacy of Defense Counsel's Representation of Criminal Client Regarding Argument (1981) 6 A.L.R.4th 16.)

■ Here, Welch's closing argument effectively withdrew a crucial defense and admitted his client's guilt without his client's consent. Moreover, in the unusual circumstances presented here, ineffective assistance of counsel is apparent on the face of the record; there is simply no plausible tactical explanation for Welch's bizarre argument.[13] (Cf. *People* v. *Pope, supra,* 23 Cal.3d at p. 428.) "[W]hat is here involved is not a misguided though reasonably plausible strategy decision but clear ineffectiveness of counsel; why else proffer an unrecognizable defense . . . [?]" (*People* v. *Bell, supra,* 401 N.E.2d at p. 181.) Welch's closing argument therefore constituted prejudicial ineffective assistance of counsel under the Sixth Amendment to the

---

[13]The question of what defense counsel should do when he believes his client will give perjured testimony is currently pending before the United States Supreme Court. (See *Whiteside* v. *Scurr* (8th Cir. 1984) 744 F.2d 1323, cert. granted Apr. 15, 1985, *sub nom. Nix* v. *Whiteside,* — U.S. — [85 L.Ed.2d 298, 105 S.Ct. 2016].) We need not resolve those issues here. Even assuming arguendo Welch believed Colbourn had given perjured testimony, it is inconceivable that Welch's remedy was to make the closing argument that is at issue here.

United States Constitution and under article I, section 15 of the California Constitution. (*Herring* v. *New York, supra,* 422 U.S. at p. 862 [45 L.Ed.2d at p. 600]; *People* v. *Davis, supra,* 48 Cal.2d at pp. 256-257; *People* v. *Bell, supra,* 401 N.E.2d at p. 181; *People* v. *Robinson, supra,* 387 N.E.2d at pp. 1116-1117; see also *People* v. *Neeley* (1980) 90 Ill.App.3d 76, [45 Ill. Dec. 428, 412 N.E.2d 1010, 1015].)

The question remains whether Colbourn's conviction must be reversed. Our Supreme Court has held that the withdrawal of a potentially meritorious defense in the circumstances shown here is fundamentally unfair and constitutes a "miscarriage of justice" requiring per se reversal of the judgment. (*People* v. *Davis, supra,* 48 Cal.2d at p. 258; see Cal. Const., art. 6, § 13; *People* v. *McDowell* (1968) 69 Cal.2d 737, 751 [73 Cal.Rptr. 1, 447 P.2d 97].) The United States Supreme Court has recently held that in order to obtain a reversal of a conviction on grounds of ineffective counsel, a defendant must show that there is a reasonable probability, but for counsel's unprofessional errors, the result would have been different. (*Hill* v. *Lockhart* (1985) 474 U.S. —, — [88 L.Ed.2d 203, 210, 106 S.Ct. 366; *Strickland* v. *Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 698, 104 S.Ct. 2052].)

Here, even if the federal test is applied, the conviction must be reversed. When we review the whole record, including the conduct of the victims and the fact Colbourn was found guilty of a lesser included offense on one count, we believe it reasonably probable the result below would have been more favorable to defendant in the absence of counsel's unprofessional errors.

There remains the question whether Diggs' conviction must also be reversed. We believe the issue is controlled by *People* v. *Davis, supra,* 48 Cal.2d 241.[14] There, counsel for Davis, one of two codefendants, gave a supplemental closing argument in which he withdrew his prior argument and, in essence, conceded his client's alibi defense was without merit. (*Id.,* at pp. 253-254.) Holding that both Davis and his codefendant were entitled to a new trial, the court said, "The argument of counsel for Davis also prejudiced the rights of his codefendant Morse to a fair trial. They were

---

[14]The People have filed a supplemental brief citing various federal cases holding that defendants do not show an abuse of a trial court's discretion in ordering defendants joined for trial where the argument of one defendant may be prejudicial to a codefendant. (See, e.g., *United States* v. *Reda* (8th Cir. 1985) 765 F.2d 715, 722; *United States* v. *Boyd* (8th Cir. 1979) 610 F.2d 521; *United States* v. *Robinson* (1970) 139 App. D.C. 286 [432 F.2d 1348].) Because these cases involve discretionary joinder and severance orders, they do not control the present claim arising out of incompetent assistance of counsel. More importantly, the People have not distinguished *People* v. *Davis, supra,* 48 Cal.2d 241, a case which we are bound to follow. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

jointly charged, tried and convicted. There was evidence that both had jointly participated in the commission of the offense. When Davis' counsel placed Davis at that scene the effect on the jury could have been the same as to the defendant Morse. Where the rights of defendants have suffered such an interference or interruption as to fatally affect the regularity of the trial and conviction, a miscarriage of justice has resulted and both defendants are entitled to a new trial. [Citation.]" (*Id.*, at pp. 257-258.)

Here, the same conditions as in *Davis* apply. Because of the "in concert" allegations, defendants were jointly charged. Their defenses were complementary, not antagonistic: each denied criminal participation. Welch's argument was aimed at both defendants and conceded Diggs' criminal participation, although Welch's client had no interest in his doing so. The jury could not have disregarded the fact that Welch, as counsel for one of two defendants in the circumstances described, was effectively arguing that the jury should disbelieve defendants' testimony denying criminal participation. Welch's incompetence regrettably infected the proceedings to an extent constituting a denial of due process of law and a miscarriage of justice under our state Constitution.[15] (Cal. Const., art. I, § 7; art. VI, § 13; *People* v. *Davis, supra,* 48 Cal.2d at p. 258.) Diggs' conviction must therefore be reversed. (*Ibid.*)

Because of our resolution of the case, it is unnecessary for us to address many of defendants' other contentions of evidentiary error. However, in anticipation of a retrial and for the benefit of the trial court, in an unpublished portion of this opinion we resolve some additional issues tendered by defendants.

## II*

. . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

As to each defendant, the judgment is reversed.

Regan, Acting P. J., and Sparks, J., concurred.

---

[15]We presume the State Bar of California, to whom we are sending a copy of this opinion, will promptly investigate Welch's aberrant conduct.

*See footnote, *ante,* page 958.

## APPENDIX A

### REDIRECT EXAMINATION

BY HOWARD WELCH, Attorney at Law, on behalf of Defendant Richard Ernest Colbourn:

Q. Switching back, Rick, to this paraphernalia, where do you buy those syringes?
A. At pharmacies, drug stores, but I haven't bought them before.
Q. How about the needles?
A. Have I bought them?
Q. Well, the needles come with the syringes, do you happen to know?
A. Syringes are needles.
Q. Oh, I see. Oh, you mean the plastic kind that you shoot livestock with about this long and they have about 15cc's; is that it? [Indicating]
A. Yeah.
Q. Now, didn't you say something about 50cc's of—
A. I think they go all the way up to 60.
Q. It wasn't this long? [Indicating]
A. No.
Q. About like that?
A. Yeah, about that long.
Q. All right. Now, we know also you bought some paper?
A. Rolling papers.
Q. Yeah. Is that the Bulldurham type of paper or is it that special for pot?
A. Just Zig Zags.
Q. I beg your pardon?
A. Zig Zags they are called.
Q. I see. Now, in purchasing the beer, I think you said you split the cost of buying the beer when you stopped at Raley's Market with Steve; right?
A. Circle K.
Q. And did you furnish the bulk of the beer financially that night?
A. Well, after we got the first case I did, yes.
Q. All right. Where do you get your money?
A. I get Social Security.
Q. Why do you?
A. Or I did for going to school.
Q. And why did you get Social Security?
A. Because my dad's passed away.
Q. Yeah. At what age were you?
MR. COZENS: Objection, irrelevant.
THE COURT: Sustained.
MR. WELCH: All right.
Q. [MR. WELCH] Now—well, in any event, how long have you been receiving Social Security?
MR. COZENS: Objection, irrelevant.
THE COURT: Sustained. What is your claim as far as relevancy, your Honor [sic].
MR. COZENS: I'd like an offer of proof, your Honor.
THE COURT: All right.
MR. WELCH: If I may, that he's on Social Security and had been—
THE COURT: Well, if you want to make an offer of proof, come up to the side bar here.
MR. WELCH: All right.
[Bench-side conference between Court and counsel out of the hearing of the jury and the reporter]
THE COURT: The objection is sustained.
Q. [MR. WELCH] Now, opposing counsel, the prosecutor mentioned rock and roll. As a matter of fact you heard Tim say that hard rock was played and heavy rock on his tapes right?

A. Right.

Q. Do you know the difference between rock and roll and heavy and hard rock? Do you know what acid rock means?

A. Yeah, in a way.

Q. What does acid rock mean?

A. Oh, I don't know. I mean, it is kind of a—kind of a weird music.

Q. All right. What is amphetamines?

A. Amphetamines, it is like a speed, an upper.

Q. It is known as acid?

A. Now-a-days, yes.

Q. All right. Now, they have mushroom acid. Did you ever try that?

MR. COZENS: Objection, irrelevant.

MR. WELCH: Well, it is not. We are talking about acid music.

MR. COZENS: Mr. Martin brought in all the other drugs this man had done.

MR. WELCH: No, mushroom acid was not mentioned.

THE COURT: Well, mushroom acid, no. All right, I'll allow it. Overruled. Go ahead.

MR. WELCH: Thank you, your Honor.

Q. [MR. WELCH] Did you ever try mushroom acid?

A. Well, mushrooms are a psychedelic high.

Q. They what?

A. Mushrooms are just like a psychedelic high.

Q. Let's see. Now, I think you mentioned you tried LSD over the course of your track record, right?

A. Years ago I've done that.

Q. I see. Now—however, you indicated you did not know the songs nor the performers, but was the music loud?

A. Yes.

Q. So you heard music even though you didn't know who was playing it, correct?

A. Yeah. I can't recall what, you know, certain songs.

Q. Do you know—own a TV set?

A. Yes.

Q. Do you own one?

A. Yes.

Q. Do you watch it much?

A. Yes.

Q. How often do you watch it?

A. Well, all the time.

Q. Well, what do you watch?

A. Good movies when they come on or—

Q. You don't watch the news all the time; do you?

A. No.

Q. You were—do you ever watch any girl shows?

A. Yeah.

Q. Well, is that girl shows predominantly what you watch?

A. I'd say so.

Q. Do you ever go to porno movies?

A. One time—two times.

Q. Two times. All right. You say you watch is [sic] all the time. Is that in the course of the evening or the afternoon or what?

A. In the evening.

Q. I see. Anybody else in there watching it with you?

A. No.

Q. Do you ever watch any violent show involving guns?

A. Sure.

Q. All right. Any particular shows that you are in favor of?

A. The FBI show, Magnum P.I. or—

Q. How about police shows?

A. Yes.

Q. Do you relate to the police shows?

A. What do you mean "relate"?

Q. Well, here's the TV show, you relate to it, because when you see it, you identify with the subject?

A. Yeah.

Q. All right. Now, the police shows have girl cops?

MR. COZENS: Objection. This is irrelevant.

THE COURT: Well, just a moment. I am trying to think of any possible relevancy.

MR. WELCH: This is a sex case, your Honor.

THE COURT: I don't know—

MR. WELCH: We have male and female gender. The question is whether or not he watches female cops.

MR. COZENS: On television.

THE COURT: The objection—

MR. COZENS: Not on the street.

THE COURT: The objection is sustained.

MR. WELCH: All right, sir.

THE COURT: I can't see it would relate to any possible defense.

Q. [MR. WELCH] With the money that you got from Social Security did you ever buy one of those things, the tapes, I don't happen to own a TV set, but one day I'll buy one when they clean it up, what's the name of that stuff you copy movies with?

MR. MARTIN: Batamax [phonetic].

THE WITNESS: Those are expensive, no.

Q. [MR. WELCH] Video cassette recorder.

A. No.

MR. COZENS: Objection, irrelevant.

THE COURT: The objection is sustained.

MR. WELCH: No further questions, your Honor.

## APPENDIX B

[Closing Argument of Defense Counsel Howard Welch]

MR. WELCH: Now, procedurally, ladies and gentlemen, I have one opportunity to explain to you my views of the case.

Now one of the byproducts of this case is—that which I didn't anticipate is that I am older and necessarily when I talk to you, it is impossible for me to escape the training I have had, and one problem too, is that he's twenty—he's twenty, and the kids are eighteen, and I want to be careful and not pontificate, you see, and stand here and try to tell you how to think about a very personal thing called sex.

However, I think we should go into a little bit of the history of the behavior patterns of people.

The young man here mentioned it is a permissive society.

Now, do we want to decide issues on a permissive society because the law that is set forth or he had it on his diagrams is passed at the time when I suspect the society was not permissive.

In other words, when you walk down the street, you look up at the tall buildings, half of them are young and half are old.

Some are a hundred years old, you see.

It is one of the, again, byproducts of organized European types, because we are constantly living with older people, younger people, and they're in a migratory weaving sensation, and now we've gotten into a situation where in the last thirty or forty years, since World War II, we have become one world, and sex has been—its social patterns have been altered probably through fear.

You see fear—now, what is the description of the sixties where we have kids that jump into cars and kids that shoot dope and was it the Vietnam War, the stress of the nuclear

fears, and even in this morning's Bee there is an article that the Sheriff's Department and another agency are fighting over how to handle stress.

You see, it is natural picture and at least it is common.

Now, what I want to try to do is convince you that these kids today are living in a post-graduate course for crime, and the issue is whose fault is it?

They don't vote and why don't they? It is too complicated. It is too slow, you see.

Now, environmentally, I made a statement here to the effect that this is a pleasure oriented state, as was Florida.

One of the byproducts of a pleasure-oriented state is that you have a lot of food, you have a lot of shelter, you have beautiful climate, and then you get into luxury oriented things, such as dope, music, behavior patterns that are erratic.

And the issue is how do you handle it.

These kids aren't just a few. They're all over the place.

It is a national disaster.

Now, I want to try to suggest to you my views as to how it happened.

Now, naturally, I don't know everything, and I just have an opinion, but I'm entitled to tell you what it is.

Now, one thing you have got to understand about ourselves, all of us live in an invisible world.

Each one of you, I don't care who you are, everybody in this room, everybody in the world, and the invisible world is composed of—of the influences upon you, the moral and otherwise as a young child altered by your new job, altered by your teacher, altered by your church, if you go, altered by the music that you hear, and you become conditioned, and we are conditioned to constantly propoganda, sex and violence, and if you can, eat all you want.

Magazines and the television industry, four letter words, you go down here to a—I saw a movie with Ann Margaret, it was terrible.

She's a beautiful thing. She had no excuse to play in it, but that's the way it is.

You see, you have got to understand the way things are.

Now, when these kids get on the highway and they step into this car, I'm not—they don't know what to expect, but in philosophy they taught us that men and women hunt each other.

Now this is three or four hundred years before Christ, men and women hunt each other, and it is the greatest hunt on earth. It isn't ducks, it isn't geese. It isn't deer.

It is the man and the woman, and I may suggest that in all situations those young ladies were hunting for boys, giving notes out, switching from one to the other, and the kids' fake standards, macho, comes out.

The muchachas, the ego. You see what's wrong with that.

The question is that we have got to be careful that—that when we find verdicts that we are doing it where these people have an intent to do things that we don't know anything about.

You know, a general criminal intent, specific criminal intent is altered by your—your—your will, but tell me, is there such a thing as a free will?

You know, we're stuck with everything right today.

You know, what is freedom? You know, somebody wrote a—what I thought was sort of a pathetic thing about the bird. I have forgotten the name of the bird, but he wanted to fly higher and higher and higher, you see, until—but he got into trouble, and then you get into, well, how much land do you own.

They often tell the story about the—when we talk about California rich land, the story about a chief put an ad in the paper over in Afghanistan or some place like that, he gave all the—the land that someone could run around from sun up to sun down and people appeared on this given date, and this one man started out by direction of the chief, and he had a few of his tribes there, and the man started running with the sun.

You know, he says, well, I'll go a little further, I need a little more land.

So he ran a little further and a little further, and my gosh, I have got to have some more, the sun is still up, it is getting warm.

You see, he's running out of water.

Come nearly sundown, he began to stumble, you see, and I'll just get a little more land, and he stumbled and came in, and he dropped right at the chief's feet, the finish line, but not quite enough to make it, and the chief says, I thought so.

All you need is six feet long and three feet deep.

Now, we've got to be careful what we're doing to these young people.

They didn't vote.

Their general intent is a byproduct of their family problems, and there is a lot of them.

The young men up here testified they look like good looking kids.

One had been in a war.

What happened was that—that really this dope came out of a tropical oriented paradise and war-frightened kids, you see it on television, grew long hair.

CBS bought out Fender Division, one of the biggest guitar companies in America, and they laid it on them, they played that saw-mill music, and it just scared us to death.

It entertained a lot of people.

Of course, I am a little bit prejudice, because I won't buy a TV set. Once I saw it, I never did buy one, never will, because it is pleasure oriented, you know, and it creates materialism and deceptive consumer attitudes, and these kids are stuck with that.

You turn a knob and you have instant life.

Now, one thing about the group movements of young people, they have a term for it, I'm not sure it is in here, let's see if it is in here.

I better know how to spell it.

Nihilism. N-i-h-i-l-i-s-m.

In philosophy the denial of existence of any basis for knowledge or truth.

The general rejection of customary beliefs and morality, religion, et cetera, ethical nihilism in politics, the doctrine that all social, political and economic institutions must be completely destroyed in order to make way for new institutions.

Specifically it's got B here, a movement in Russia in the '60s and 1970s which advocated such revolutionary forces and an attempt to carry it out through the use of terrorism and assassinations.

Well, I'm not suggesting anybody is at fault.

Nihilism is not new in philosophy. It is an ancient movement on the part of young people who look at their mothers and dads, and I think the first volume of consequence that really put—pointed it out is called fathers and sons, and it creates an atmosphere for the young who, incidentally marked—are getting their board.

These kids don't even earn their own board and room, and the daughters, the young girls are moving in living together, and that rent has to be around 350, 400.

They just moved out. They're going to have a tough time.

That's the problem we have got to face here, and we find constantly where young people are living together, even older ones, because they have to have a roof over their head, and then we catch them ten years later with a baby, and they're not married.

We catch them in court here.

So we're trying to straighten this out, but you can't have instant happenings, you see.

Now, that's the fears that these kids have, and so one of the byproducts again is nilihism.

Why can't I have this?

You see, until you have a baby and get your own board and room, they don't realize.

They're living on their parents or living on the government.

You see, the first thing you know you've got a disorganized society that's got a bad trend.

They'll come in and steal your women, steal your young boys.

Now, let's get into the issue of—we made some remarks about music.

Music was something I brought up, and I remember vividly in my training as a young man three hundred and fifty years before Christ, I think it was Plato said that music is a moral law, it gives a soul to the universe, wings to the mind, and charm to sadness and a flight to the imagination. It leads to all that is just and beautiful, but is, nevertheless, invisible and dazzling in its passion and external form.

There is nothing better than that definition of music, and without a doubt some of these lyrics can't possibly create an organized sex attitude society without creating fractures in the behavior patterns of people according to the dogma, and the law that we then have in existence. It is physically impossible, and we're in trouble.

Now, there has been some evidence here testified to about girls—about the young man here, Colbourn, slapping the girl around.

Now, you get into attitude. He did this.

Is it a sadistic tendency?

Now, is he a sadist? What is a sadist?

These kids know what a sadist may be.

It is in here. Let me keep—I don't want to pontificate.

Sadist. An aberration of getting sexual pleasure from dominating, mistreating or hurting one's partner physically or otherwise, getting pleasure from mistreating and hurting others.

I don't believe he's a sadist. I think he is confused, because if he had this inability due to drugs, which was brought out by the lady doctor, I don't want to go into, because she was obviously annoyed, but when you drink, as indicated there, and drugs, you can't fulfill the emotional vascular problems and anxieties of sex, and, in other words, at that time the monster left him, and so he became, and he was in a state of mental condition.

Anyway, he became, attitudewise, a problem, you see, which was testified to here.

We have to have a solution, because he's got a good sense of humor, and he's got good brothers. This is important.

Now attempts were made of oral copulation, things like that, to get out of the dilemma.

Now, generally these things are—are frightening, but you have got to understand our heritage.

You see, it is entirely possible that we were unisexual, and I remember in sociological training by a marvelous professor, it was brought out by him, and I ran across the old book, it is pretty dusty, and I'm looking at unborn fetuses parallelism of the fish, the salamander, the turtle, the chicken, the pig and the calf, the rabbit and man, and they're identical, and they have gill slits.

All of us were born with gill slits here, and they disappear.

Now, I'm not here to get into evolution, because I'm not interested in that.

I am talking to you about the sex habits of these creatures.

It says right here it is amazing right there. Okay.

Okay. Now, then we also have classifications, they are all broken down here into categories, the filum, cortex, the mammalia, the young lady, Kathy, has large mammory glands.

She knows it, and I'm not sure she handles it as delicately as she should, because right away she knew she was a sex pot. You could tell by looking at her on the stand.

That's all right. They're both nice girls doing the best they can, you see, but they had to know by their past, the fears which they took upon themselves by getting into the car attendant upon having a party and smoking pot and going elsewhere.

There is no way in the world you could hold onto the count of kidnapping. It is ridiculous.

I think the D.A. sold over his pleadings, and the moving from one spot to another, there is always a lover's lane when you get in the car with some young kid and you are a good looking girl, and I'm not making excuses for the boys and girls. It is just that that's the name of the game.

Now, one thing too that concerns me, if you are eighteen, can you break those laws, which sometimes can be serious like buying beer?

If the young girl wanted a beer and had these guys under twenty buy it, which is a violation of the law, I am not blaming anybody, but sometimes this drinking in cars can turn into a bigger tragedy than we've got here in the courtroom. Somebody is killed, you see, maimed.

I don't know, you know, that's not charged, that isn't what this case is charged with, but at the same time it is again a byproduct, and kidnapping is generally a social extortion.

You kidnap someone, you send a note, you want $50,000.

I never heard of a—a kidnapping—I don't go around practicing rape cases quite a bit, but this is kind of ridiculous here, number eight.

Diggs said, "Looks like she likes it."

Why not? Girls like sex. Boys aren't supposed to be the only ones that relate to it.

Now, one thing too about this permissive society, we have this pill thing.

When you are raising beef cattle, I've been around them for thirty years, there is a measured sex, dogs have measured sex, and I'm not sure that there isn't some natural law of the Lord that we have got to look out for.

I don't happen to believe that extraordinary sex has been—has created a solid society.

I think it is going to be a tragedy we may never get rid of it, we may never get rid of drugs.

Now, has any other nation been exposed to drugs?

For example, you know the kids were on it in Vietnam, and there was opium over—all over the place, but in 1842 there was an opium war imposed upon China, and they came in with a fleet, and the dope was coming out of the Middle East, I think it was Turkey—no, it was Persia, which is now—to me it is still Persia, and they wanted the customers to continue.

There is money in dope. There is money in pot.

Some of these kids make 10,000 for a crop, and now you've seen in the paper, it is a matter of common knowledge, that they're trying to kill it by chemicals.

They might even do that, but you get out here, if you're an environmentalist, a hunter and go out there, they'll whack you, because they think you are exposing yourself to the local sheriff, a local sheriff like in Humbolt County.

They won't even go out there.

I happen to know of a couple of personal murders that are of record.

In any event, the opium war of 1842 as a result of the settlement of England got Hung Chow, Nan King and Hong Kong, and they still have the only occidental entry to Hong Kong, which is the type of civilization which may be the one we'll be faced with one day, but it took them a hundred years to get out of it.

It came to my attention recently, as a matter of fact, a mother told me about a captain in the U.S. Air Force, the officer said a young kid came on the airplane out of Vietnam, an airman, and the Chinese in Taiwan knew that he had opium—an amount of opium on him through customers, they had him shot in a half hour, you see.

Now, they're not going to tolerate it.

If you get dope over in the Middle East, even in Turkey, Saudi Arabia, they cut your hand off, and they'll shoot you.

You see, another thing too, it is funny about sex habits.

One of those countries, the Middle East, Moslem, if you are a woman, you set still, you are fair game for sex.

You have got to keep moving, and even the king's niece who went to a nightclub was considering marrying a European was beheaded. A movie was made on it.

Saudi Arabia got mad, affected our diplomatic relations.

Now, these cultural things that are moving into the West Coast are not on the East Coast. They've already had it.

The Irishmen are in trouble. My Irish grandad was a cop in New York, and, you know, those problems there are internal, but the sex habits of the Moslems are internal.

Now, Sarah couldn't have children. Later they have Isaac and they are fighting in Lebanon.

Now, we're in trouble. We've got to reconcile these habits, you see.

All of this confusion comes right down to drift into these kids that are into this courtroom, all four of them.

Now, there is too many counts there for one evening. They've got ten counts.

Makes it ridiculous.

You know, there is an attempt, and they're—if you consider it proven to convict them, I can't see how you can get by one count on each side.

I don't believe this is concert.

This kid here, Colbourn, he shouldn't get stuck with any type of—or oral sex, and I admire the little girl who resisted.

You see, she resisted this, and it is the way to do it.

You see, we don't want any hangups. We don't want any fixation among our daughters, you see.

Now, the girls, naturally, wanted to testify to protect their angelic behavior and little Kristen was candid and the boys were candid.

The boys said they were kissing, and we have this leg scene, which was vividly described by Jack Martin here, the attorney for Diggs, and, you know, these things cause problems, and when they got into the car to go out, there is not any evidence of real consequence that they didn't know where they were going, but one unfortunate thing was that we're charged with attempting to rape Kathy.

There is no evidence of attempting to rape that Kathy that ran off.

She was mad because the kid was supposedly, according to the testimony, whacking her around.

He didn't rip her clothes off.

As a matter of fact, according to the testimony, the clothes were taken off very delicately even with [Kristen], so—but he didn't take his clothes off and fool with this Kathy.

Nothing was—there was no exposure.

It is a ridiculous count. It is sad, because you wrap those kids up, we don't want to turn them into monsters, they got a chance.

Now, there has been a lot of stories about sex, and I don't want to bore you too long with it, it is just that when you get dope, and I think we can take the matter of common knowledge, dope creates bank robberies, lust, sadism, masochism, bitterness, depression, stress.

The depression is a byproduct of booze.

After three drinks there is nobody on earth if they stay with it long enough, and these kids are young, if they keep this up drinking for ten years, they're out of business. They're going to get a knot on the head with the Lord.

They're not going to be—see properly, think properly, and a lot of these kids even fooling around with music, but I don't think he was fooling with music.

They can't even hear it is so loud.

There is a kid twenty-one, he plays in a band, and he can't even hear. He gets the beat from the rhythm. He's twenty-one years old, but this is what it is all about.

It is a commercial matter, you see.

Now, let's assume for the moment—we have a materialistic society that causes all this, and I wonder about materialism.

Materialism, I don't know, I like to use the standard things, because sometimes people don't even look at them.

Yeah, here's materialism.

In philosophy the doctrine that is that matter is the only reality and that everything in the world, including thought, will, and feeling can be explained only in terms of matter.

The opposed to idealism. The doctrine that comfort, pleasure and wealth are the only or highest goals or values than the tendency to be more concerned with the spiritual goals or values.

Well, somebody is going to try to tell me that we don't have a portion of our society that's materialistic? They're talking to—to the wrong lawyer.

We—I'm not sure just how we're going to handle it. No one is.

Materialism is what creates these kids. It is their constant environment, and the girls, we're stuck with them.

We're stuck with the theory that this land doesn't produce anything. There isn't going to be any materialism if you can look for ninety miles and nothing will grow. Materialism is out of the business, you see.

But the spiritual values aren't.

Now, getting back to this issue of sex, it is interesting. In—what's his name—Somerset Maugham, was a marvelous dramatist, and I saw a show he wrote called The Moon at Sixpence, George Saunders played in it, one of the most amazing things ever written about a Frenchman who wanted to be an artist, I have forgotten his name, and Maugham, after he died—or during his life was a homosexual, and I don't want to go over the—the evidence too much, we went over it so many times that you know it by heart.

One problem I have is I have to tell you my views on sex. It is not my problem. I think it is only fair.

There was a famous Lady Campbell [phonetic] in the Nineteenth Century. She was the counterpart of the late Nineteenth Century George Bernard Shaw and Oscar Wilde.

Now, Oscar Wilde was a known homosexual. I'm not accusing anybody of being a homosexual, you know, talking about sex.

Oscar Wilde wrote the cleverist. He was beloved by the European continent, spoke all over the nation to packed houses, but he made the imprudent mistake of filing suit against a lord who suggested openly that he was homosexual, and they proved that he was, jailed him, and he died in poverty.

And one of the clever things he says, somebody gave him a bottle of champagne, he says, "I'm buying beyond my means."

But Lady Campbell was asked what she thought about it, because she played in his dramas, of course, the men are always sort of inquisitive, pointed out here in our processing that all men are voyeurs and women are exhibitionists, clothing, perfume, eyelashes, et cetera.

Boys are peeping around always looking at magazines, et cetera.

Let's be practical. It is a big industry.

But, in any event, Lady Campbell was talking to those men, and they asked her what she thought about the case, and she says, well, gentlemen, I have to make myself perfectly clear. She says, I am for sex, but let's keep it confined in the home. Don't let it get out in the street and scare the horses, and I think we scare the horses today in this proceeding.

But there is nothing we can do about it.

It is up to you, and I want to thank you.